**Joseph Allen WILSON, Petitioner-Appellant,**

v.

**Hon. Robert J. HENDERSON, Superintendent, Auburn Correctional Facility, Respondent-Appellee.**

**No. 832, Docket 78–2015.**

United States Court of Appeals, Second Circuit.

Argued May 23, 1978.

Decided Sept. 20, 1978.

Oakes, Circuit Judge, dissented with opinion.

Jeffrey Ira Zuckerman, New York City, for petitioner-appellant.

Louis J. Lefkowitz, Atty. Gen. of the State of New York and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City (Arlene R. Silverman, Asst. Atty. Gen., New York City, on brief), for respondent-appellee.

Before OAKES, Circuit Judge, and BLUMENFELD * and MEHRTENS,** District Judges.

MEHRTENS, District Judge:

In the early morning of July 4, 1970, three assailants robbed the Star Taxicab Garage and murdered the dispatcher on duty. Three Star employees identified the petitioner, Joseph Allen Wilson, as having been on the premises before the crime. Two testified that they had seen Wilson, a former employee, running from the scene after the incident, cradling money in his arms.

Four days later Wilson voluntarily surrendered himself to the authorities. He was promptly arrested and advised of his constitutional rights by Detective Walter Cullen. Wilson acknowledged seriatim that he understood each of his rights. At the conclusion of the recitation of rights, Cullen asked Wilson if, understanding all of his rights, he wished to make a "statement." Wilson replied, "No." The officer then queried, "Well, would you care to tell me what

---

* Hon. M. Joseph Blumenfeld, Senior United States District Judge for the District of Connecticut, sitting by designation.

** Hon. William O. Mehrtens, Senior United States District Judge for the Southern District of Florida, sitting by designation.

you did on July 4th?" Wilson responded affirmatively and revealed to Detective Cullen that he had been at the scene and had witnessed the crime, but insisted that he had not been personally involved. Wilson claimed to have fled the premises for fear of being blamed.

Wilson concluded his narrative with the words, "And that's all." Cullen asked Wilson if he would care to tell him where he was between July 4th and the 8th. Wilson emphatically replied, "No, that's all I have to say." At that point the questioning ceased, and Wilson was removed to a detention cell. Counsel was subsequently assigned to represent him.

Wilson's cellmate, Benny Lee, had previously agreed to act as an informant for Detective Cullen. Lee was specifically instructed not to inquire or question, but to keep his ears open for information which could lead to the apprehension of Wilson's accomplices.

Initially, Wilson repeated to Lee the same version of the facts that he had related to Cullen. Lee's only comment was that the story did not sound too good. By the end of the third day, Wilson made an auricular confession to complicity in the robbery and murder.

Wilson was indicted and charged with common law murder and possession of a weapon as a felony. Prior to trial, Wilson moved to suppress his statements to Cullen and Lee. In accordance with *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), the state trial judge held a pre-trial hearing on the issue of the admissibility of the inculpatory statements made by Wilson. The court ruled adversely to Wilson, and the statements were admitted at trial. The jury returned a verdict of guilty on both counts, and Wilson was sentenced to a term of from twenty years to life on the murder conviction and to a concurrent term not to exceed seven years on the weapons count. The conviction was affirmed by the state appellate court and leave to appeal to the New York Court of Appeals was denied.

The instant appeal is taken from the district court's order denying Wilson's petition for a writ of habeas corpus. Wilson cites as error the admission at trial of his statements to Cullen and Lee, and also challenges his conviction on the grounds that he was denied a speedy trial and that the denial of his discovery motion made it impossible for him to adequately prepare his defense.

I

Wilson contends that the use at trial of his statement to Detective Cullen violated his privilege against self incrimination under the Fifth and Fourteenth Amendments. He argues that his initial refusal to make a statement was undermined by continued interrogation. The district court found that despite Wilson's hesitance at the outset, the subsequent remarks to Cullen were clearly voluntary and were not coerced. Wilson submits that the district court's finding disregards the clear command of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that "interrogation must cease" if an individual "indicates in any manner . . . that he wishes to remain silent," and that any subsequent statement "cannot be other than the product of compulsion." 384 U.S. at 474, 86 S.Ct. at 1628.

When the *Miranda* Court decreed that the interrogation must cease upon invocation of the right of silence, it did not create a *per se* proscription of indefinite duration upon any further questioning. The Court clarified the *Miranda* holding in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where it approved the resumption of custodial interrogation following renewed warnings. The Court determined that the admissibility of a statement made after a suspect has exercised his right to remain silent depends on whether his "right to cut off questioning" has been "scrupulously honored." 423 U.S. at 103, 96 S.Ct. 321.

*Mosley* buttressed this court's antecedent conclusion in *United States v. Collins,* 462 F.2d 792 (2nd Cir.) cert. denied 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972), that

questioning can resume after new warnings have been given. In *Collins* the defendant was advised of his rights and questioned no less than six times during 21 hours in custody before confessing to participation in a robbery. Government agents advised the defendant of his right to halt any questioning, and the interrogation immediately ceased when the defendant indicated that he did not want to discuss the case. This court held that the police may ask a defendant to reconsider his refusal to answer questions and stated:

So long as such reconsideration is urged in a careful, noncoercive manner at not too great length and in the context that a defendant's assertion of his right not to speak will be honored, it does not violate the *Miranda* mandate.

462 F.2d at 797.

*Collins* represents an attempt to balance the exigencies of criminal investigation with the strictures of *Miranda*. The *Miranda* Court recognized that custody creates an inherent compulsion on an accused to incriminate himself. *Miranda's* prophylactic requirements were devised in part to counteract the coercive pressures of the custodial setting, and to assure with reasonable certainty that an in-custody confession is the result of a knowing and voluntary waiver of an individual's privilege against self incrimination. *Collins* suggests that in some instances persistent yet moderate interrogation may be permitted when accompanied by sincere affirmations of the accused's constitutional rights and by efforts to temper the coerciveness of the custodial atmosphere.

The absence of "badgering from relentless interrogators" is even more apparent in the instant case than in *Collins*. 462 F.2d at 797. Cullen's question, "Would you care to tell me what you did on July 4th?" could fairly be construed as an explanation to Wilson that a "statement" need not be a confession and as an attempt to ascertain the scope of Wilson's refusal to make a "statement." It would reasonably be consistent with the officer's experience to believe that a suspect who voluntarily surrenders to the authorities, acknowledges that he understands each of his rights and does not request counsel may well wish to offer an exculpatory statement. Indeed, Justice White in his concurring opinion in *Michigan v. Mosley,* warned against a construction of the Fifth Amendment which would "imprison a man in his privileges" and which would thwart the ability of a suspect to explain a particularly incriminating fact or to supply an alibi that would result in his immediate release. 423 U.S. at 109, 96 S.Ct. at 329, quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 280, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

When asked if he would care to talk about what he did on the day of the crime, Wilson's response was an unhesitating and unequivocal "Yes." His exculpatory version of the facts was related in narrative fashion and not in response to a series of questions by the officer. The record reveals that it was Wilson's decision to terminate the session. When he indicated that he had nothing further to say, Wilson was promptly removed from the interrogation room which demonstrates that his "right to cut off questioning" was "scrupulously honored."

■ The instant case differs factually from *Mosley* and *Collins* in that in the latter cases the interrogation ceased when the defendants declined to speak and did not resume until a period of time had elapsed and renewed warnings were given. We are not of the belief, however, that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning. Nor are we persuaded that the rationale of *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1970) cert. denied 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971) should be applied under the circumstances of this case. The import of *Crisp* is that, despite seemingly innocuous police conduct, not even the slightest deviation from the *Miranda* decision may be tolerated. *Michigan v. Mosley,* however, explained that *Miranda* did not establish inviolate, *per se* rules and that the *Miranda* safeguards should not be transformed into

irrational obstacles to legitimate police investigative activity. Although the Court in *Mosley* condemned the resumption of questioning after a momentary respite, such criticism focused on the fact that relentless rounds of interrogation would undermine the will of the person being questioned and would frustrate the purposes of *Miranda.*

There is not a hint in the record of the instant case that Wilson's will to resist was overborne by persistent or coercive questioning. To the contrary, Wilson appeared to control the interrogation. We return, therefore, to the observation in *Miranda* that the critical safeguard is the right to cut off questioning, and we conclude that that right was scrupulously honored herein. Accordingly, the petitioner's Fifth Amendment privilege against self incrimination was not violated under the circumstances of this case.

■ Even if the admission of the statement to Cullen had been improper, we would be inclined to find the error harmless *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The allegedly tainted evidence did no more than place Wilson at the scene of the crime, a fact which was confirmed by the testimony of several eyewitnesses. The statement, therefore, was cumulative evidence, and its admission was harmless beyond a reasonable doubt. Cf. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

As a further ground for affirming the conviction below, the respondent has urged that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precludes federal habeas corpus relief on Wilson's *Miranda* claim. The Court in *Stone* held that the constitution does not require that a state prisoner be granted federal habeas corpus relief where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim. The holding in *Stone* was expressly grounded upon Fourth Amendment search and seizure issues and the exclusionary rule. The Supreme Court has thus far carefully confined the effect of *Stone* to Fourth Amendment claims, and we

therefore decline to apply that case to Fifth Amendment self incrimination issues until the implications of such a ruling have been fully explored. See *Wainwright v. Sykes,* 433 U.S. 72, 86 n. 11, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Powell, J., concurring at 414, 97 S.Ct. 1232); *United States ex rel. Henne v. Fike,* 563 F.2d 809 (7th Cir. 1977).

## II

Wilson's next assertion is that his incriminating statement made to his cellmate, Benny Lee, was improperly admitted at trial in violation of his Sixth Amendment right to counsel under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The petitioner in *Massiah,* following his indictment for violation of federal narcotics laws, retained a lawyer, pleaded not guilty and was released on bail. A federal agent succeeded by surreptitious means in listening to incriminating statements elicited from the petitioner while he was free on bail. The statements were introduced against the petitioner at trial, and he was convicted. The Supreme Court reversed, holding that

> the petitioner was denied the basic protections of [the right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel. 377 U.S. at 206, 84 S.Ct. at 1203.

In the aftermath of *Massiah* some doubt remained as to whether all post-indictment statements made without the presence of counsel would be inadmissible, or whether such statements would be tainted only when police made a deliberate, pre-meditated effort to elicit incriminating remarks from a defendant. The Third Circuit, relying on the Supreme Court's per curiam reversal of *McLeod v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965), concluded that *Massiah* rendered inadmissible all post-

indictment statements obtained without counsel regardless of the circumstances. *United States ex rel. O'Connor v. New Jersey,* 405 F.2d 632 (3rd Cir.) cert. denied, *Yeager v. O'Connor,* 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969).

■ This circuit, however, has plainly adopted the majority view which requires that there be some circumstance more than the mere absence of counsel before a defendant's post-indictment statement is rendered inadmissible. In *United States v. Garcia,* 377 F.2d 321 (2nd Cir.) cert. denied 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967), this court refused to extend Sixth Amendment protection to a voluntary, incriminating statement made by the defendant to a federal officer where the officer was completely unaware of the existence of an indictment and was not seeking information about the crime charged in the indictment. In affirming the conviction this court said:

> Massiah was thus not aimed at all post-indictment evidence gathered by the prosecution, but at the narrow situation where, after indictment, law enforcement authorities have "deliberately elicited" incriminating statements from a defendant by direct interrogation or by surreptitious means. The rule does not apply to spontaneous or voluntary statements made by the defendant in the presence of government agents.

377 F.2d at 324 (footnote deleted).

The recent Supreme Court case of *Brewer v. Williams, supra,* strengthened this circuit's restrictive interpretation of *Massiah.* In *Brewer,* the Court stated that "no such constitutional protection [of the right to assistance of counsel at the time the defendant made the incriminatory statements] would have come into play if there had been no interrogation." 430 U.S. at 400, 97 S.Ct. at 1240.

■ The trial judge in the instant case found that there had been no interrogation whatsoever by the undercover cellmate.[1] Detective Cullen testified that Lee had been specifically directed to refrain from questioning Wilson; Lee confirmed those instructions in his testimony. The complete absence of interrogation in this case negates the proposition that Wilson's statement was deliberately elicited. According to *Brewer,* constitutional protection would not attach under these circumstances.

Absence of interrogation was also an issue in *United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977) cert. denied 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), where the court rejected the argument that interrogation is not required by *Massiah.* Hearst argued that intentional, secret listening would suffice as the prohibited "deliberate elicitation" of incriminating statements. Hearst's conviction was affirmed despite her contention that the surreptitious tape recording in her cell of her self incriminating conversation with a friend violated her Sixth Amendment right to counsel. Similarly, the court in *United States v. Fioravanti,* 412 F.2d 407 (3rd Cir.) cert. denied 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), commented that there was no violation of the Sixth Amendment where the defendant freely volunteered an incriminating statement to an undercover agent who had been deliberately arrested along with the defendant. 412 F.2d 413 at n. 15.

The instant case, therefore, is significantly different from *Brewer,* where the Court found that the police questioned the defendant with specific intent to elicit incriminating statements. The police in *Brewer* promised counsel that the defendant would not be interrogated during his transportation to another city. The defendant, accused of murdering a young girl, was known to one officer to be a deeply religious, former mental patient. The officer sought to obtain incriminating remarks from the defendant by stating that he felt they should stop and locate the body so that the little girl might have a Christian burial. The defendant eventually made several incriminating statements and directed the police to the girl's body. The Supreme Court held that the "Christian burial" speech was

---

1. This factual finding is entitled to a presumption of correctness under 28 U.S.C. § 2254.

tantamount to interrogation and that under *Massiah* the defendant was entitled to the assistance of counsel at the time he made the incriminating statement. The Court stated that there could be no doubt that the officer deliberately and designedly set out to elicit incriminating information.

In contrast, Lee did not make any effort to interrogate Wilson, nor was he placed in the cell for that purpose. Both Lee and Cullen testified that Lee's job was to listen for the identity of Wilson's confederates. In *Massiah,* the Supreme Court stated:

> We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted.

377 U.S. at 207, 84 S.Ct. at 1203.

Thus, the purpose of the investigation, *i. e.,* furtively attempting to uncover the identity of the other two perpetrators, cannot be censured. Further, where Lee did not interrogate Wilson, nor in any way attempt to deliberately elicit incriminating remarks, the rule of *Massiah* has not been transgressed.

 Nor is the fact that the informant was placed in Wilson's cell under surreptitious circumstances a distinguishing point in this case. This court has repeatedly held that a defendant's voluntary, incriminating statements made to a person known by the defendant to be a government officer are properly admissible under *Massiah*. *United States v. Garcia, supra; United States v. Gaynor,* 472 F.2d 899 (2nd Cir. 1973); *United States v. Barone,* 467 F.2d 247 (2nd Cir. 1972); *United States v. Maxwell,* 383 F.2d 437 (2nd Cir.) cert. denied 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 (1968); *United States v. Accardi,* 342 F.2d 697 (2nd Cir.) cert. denied 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965). Ostensibly, comparable statements made to undercover agents should receive similar treatment because the fact that an incriminating statement is received surreptitiously or otherwise is constitutionally irrelevant. *Brewer v. Williams,* 430 U.S. at 400, 97 S.Ct. 1232. Fur-

thermore, the admission of an in-custody statement voluntarily made to an informant seems less egregious than the use of a statement intercepted by an electronic eavesdropping device as was upheld in *United States v. Hearst, supra.* When a defendant makes a completely unsolicited, incriminating remark in a face-to-face encounter with an informant, he knowingly assumes the risk that his confidant may ultimately prove to be untrustworthy. In an illegal search and seizure case the Supreme Court stated:

> [n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.

*Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966)

Nor can such a shield be found in the Sixth Amendment.

An examination of the purposes served by the suppression of evidence further supports the decision reached below on this issue. The exclusion of reliable evidence is a remedy fashioned by the courts in order to deter impermissible police conduct and to preserve judicial integrity.

Cullen's action in this case was not the type of reprehensible police behavior which the courts feel compelled to discourage. The instructions to Lee suggest a conscious effort on Cullen's part to guard Wilson's constitutional rights while pursuing a crucial homicide investigation. His directions, "Don't ask questions; just keep your ears open," suggest familiarity and attempted compliance with, not circumvention of, the principle of *Massiah*. Under these circumstances, exclusion of Wilson's confession to Lee would serve no useful purpose. Accordingly, we are of the opinion that there was no infringement of Wilson's Sixth Amendment right to the assistance of counsel.

## III

Wilson also claims that he was deprived of a speedy trial and that the trial court's

denial of his discovery motion made it impossible for him to prepare his defense adequately. The district court ruled against Wilson on both issues.[2]

■ Wilson complains that the twenty month interval between his indictment and his trial violated his Sixth Amendment right to a speedy trial. The delay appears to have been caused largely by adjournments requested by defense counsel. When original counsel was appointed to a judgeship, further postponement was necessary in order to give the new counsel time to familiarize himself with the case. The petitioner did not object to the delay until one month before trial, and there was no indication that he was prejudiced by the delay. Under these circumstances, Wilson has not suffered a violation of his Sixth Amendment right to a speedy trial. See *Barker v. Wingo,* 407 U.S. 514, 530–532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States ex rel. Spina v. McQuillan,* 525 F.2d 813, 817–818 (2nd Cir. 1975); *United States v. Drummond,* 511 F.2d 1049, 1054 (2nd Cir.), cert. denied 423 U.S. 844, 96 S.Ct. 81, 46 L.Ed.2d 65 (1975); *United States v. Infanti,* 474 F.2d 522, 527–528 (2nd Cir. 1973).

The petitioner also asserts that he was denied his due process rights because of the state court's denial of his motion to discover police reports, records of police switchboard telephone calls, statements by witnesses and their arrest records, and all statements made by Wilson himself. The motion was initially denied without prejudice to renew

because Wilson was not at that time represented by counsel.

■ Wilson renewed his motion in open court just prior to the commencement of the *Huntley* hearing. The court advised him that it would probably delay the start of the trial, and that he should discuss the matter with his counsel. No further mention was made of the motion. The district judge concluded that it could not be said that the motion was denied, but rather that it was withdrawn, ostensibly as a matter of trial strategy. The district judge further determined that statements made by the petitioner were introduced at the *Huntley* hearing and the trial in sufficient time for Wilson to adequately prepare his defense. See *Leland v. Oregon,* 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); *Cicenia v. La Gay,* 357 U.S. 504, 510, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958).

We concur in all respects with the decision below.

AFFIRMED.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

After Wilson declined to "make a statement," Detective Cullen did not cease interrogation. Without the slightest deference to Wilson's expressed wishes, Cullen immediately asked him the question: "Well, would you care to tell me what you did on July 4th?"[1] This failure to stop the questioning violated Wilson's *Miranda* rights as

---

2. These issues were presented to the court at the petitioner's insistence and were submitted by counsel in a brief filed pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

1. Appellant surrendered at the 44th Detective Squad. There, Detective Cullen placed him under arrest. Following a short conversation between Detective Cullen and appellant's brother Michael, and then a brief colloquy between appellant and his brother, Detectives Cullen and Dunn took appellant into an office.

At a pretrial "*Huntley* hearing," Detective Cullen described the ensuing interrogation as follows:

Q. From the beginning, tell us what you said to the defendant and what he said to you?

A. He had a right to remain silent. I asked him if he understood. He said yes. I told him anything he did say could be used against him in a court of law. I asked if he understood; he replied yes. I told him he could have an attorney; he had a right to an attorney now, at any time in the future. I asked him if he understood; he said yes. I told him if he could not afford an attorney, one would be provided for him free of charge. I asked him if he understood. He said yes. I then asked him, having understood all of this, do you wish to make a statement? And he replied no.

Q. What did you then say?

A. I then asked him, "Well, would you care to tell me what you did on July 4th?"

Q. What did he say to that?

A. Yes.

enunciated in *Miranda v. Arizona,* 384 U.S. 436, 471–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and as subsequently developed in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Whatever else *Michigan v. Mosley, supra,* did to *Miranda,* it did *not* construe "the interrogation must cease" language of that much maligned case[2] "to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite." *Id.* at 102, 96 S.Ct. at 325. Just as Justice Stewart's opinion in *Mosley* observed that *Miranda* did not "create a *per se* proscription of indefinite duration" against further interrogation, *id.,* it similarly abjured the equally doctrinaire reading of *Miranda,* espoused by the State of New York and adopted by the majority, which would "permit the continuation of custodial interrogation after a momentary cessation," *id.,*[3] provided only that the suspect's will was not overborne. Rather, the Court reiterated an essential teaching of *Miranda* —that "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326 (footnote omitted).[4] Here, when Wilson declined to make a statement, he effectively exercised his right to remain silent. Surely Detective Cullen's immediately subsequent interrogation did not amount to a scrupulous honoring of that decision. *See United States v. Crisp,* 435

---

Detective Dunn then left the room and appellant proceeded to tell Detective Cullen that he had been at the Star garage looking for his brother, had heard shots and had seen the victim lying on the floor. He explained that he then fled because he "was afraid [he] would get blamed."

**2.** Since *Miranda* was decided, I believe that it has exercised two principal effects. First, it has given poor or amateur suspects the same rights that rich or professional suspects have always had. The latter have always refused to talk without their "mouthpiece." And, second, *Miranda* has required the police to do more thorough investigative work than some of them had been accustomed to doing before that case was decided. Graduates of better police training academies and FBI agents investigating professionally committed crimes had long since relied mainly upon investigative techniques other than "grilling the suspect." Unless we are to disbelieve the late Chief Justice Warren, the terrible *Miranda* rules were derived from FBI practice. *Miranda v. Arizona,* 384 U.S. 436, 483 & n.54, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1956).

But then I am in a minority, I suppose, in not thinking that *Miranda* is so horrible. Perhaps, adoption of the *Miranda* rules by exercise of the rule-making power rather than by judicial decision would have made them more palatable.

**3.** Here of course there was not even a momentary cessation of questioning.

**4.** Mosley's initial decision to remain silent was expressed in these terms:

Detective Cowie gave the only testimony at the suppression hearing concerning the scope of Mosley's earlier refusal to answer his questions:

"A. I think at that time he declined to answer whether he had been involved.

"Q. He declined to answer?

"A. Yes. Anything about the robberies." At the suppression hearing, Mosley did not in any way dispute Cowie's testimony. Not until trial, after the judge had denied the motion to suppress the incriminating statement, did Mosley offer a somewhat different version of his earlier refusal to answer Detective Cowie's questions. The briefs submitted by Mosley's counsel to the Michigan Court of Appeals and to this Court accepted Detective Cowie's account of the interrogation as correct, and the Michigan Court of Appeals decided the case on that factual premise. At oral argument before this Court, both counsel discussed the case solely in terms of Cowie's description of the events. *Michigan v. Mosley,* 423 U.S. 96, 105 n.11, 96 S.Ct. 321, 327, 46 L.Ed.2d 313 (1975).

*Mosley* is not dispositive. There questioning resumed two hours after Mosley first refused to make a statement and then only after full and complete *Miranda* warnings were again administered. *Id.* at 104, 96 S.Ct. 321. Nor does *United States v. Collins,* 462 F.2d 792 (2d Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972), control this case. In *Collins,* interrogation *ceased* after Collins stated that "'he did not want to make a statement,'" 462 F.2d at 799 (Mansfield, J., dissenting). Each time new questioning was attempted, it was preceded by fresh *Miranda* warnings. *Id.,* at 799–800. In rehearing en banc the court held simply that "'interrogation must cease' until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind." *Id.* at 802.

F.2d 354, 356–57 (7th Cir. 1970), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). On the contrary, Cullen scrupulously ignored Wilson's request.[5]

To be sure, *Miranda* has suffered "piecemeal" erosion;[6] and some would weaken it further.[7] But *Miranda* has not been overruled even though more than twenty briefs were filed in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), urging the Court to do so.[8] Unless the Court overrules *Miranda,* we as lower courts are bound to follow it.

I find the *Massiah*[9] point equally persuasive. In that case, as here, a conceded police agent was used to secure incriminating statements from a represented defendant in the absence of his counsel. There is surely no difference, except one of reliability perhaps, between the radio transmitter used in *Massiah* and the planted cellmate used here. Thus, the only real distinction advanced is that Benny Lee did not "interrogate" Wilson.[10] But the Government did not "interrogate" Massiah.[11] Certainly the Court did not rely on the fact that Massiah

**5.** In his *Mosley* opinion, Justice Stewart makes much of the fact that the subsequent interrogation related to a different offense from that for which the original warnings were given. 423 U.S. at 104–05, 96 S.Ct. 321. One commentator has suggested that this fact may be of controlling significance. Stone, *The* Miranda *Doctrine in the Burger Court,* 1977 Sup.Ct.Rev. 99, 134. In this case, however, Cullen's subsequent interrogation focused on the only crime for which Wilson was in custody and for which he initially received *Miranda* warnings.

**6.** *Id.* at 169.

**7.** *See* Ritchie, *Compulsion That Violates the Fifth Amendment: The Burger Court's Definition,* 61 Minn.L.Rev. 383, 429–31 (1977). It is interesting to note that not one case in the Supreme Court in the last five years has witnessed a single item of evidence held inadmissible on the basis of *Miranda. See* Stone, *supra* note 5, 423 U.S. at 100–01, 96 S.Ct. 321. In the recent case of *Mincey v. Arizona,* —— U.S. ——, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court excluded *Miranda* -violative admissions introduced for impeachment purposes, *see Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), because they were also involuntary.

**8.** Predictions of *Miranda's* demise may be premature. *See* Stone, *supra* note 5, at 169. Another much maligned rule, the exclusionary rule, despite some erosion, *see Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), has retained its core vitality. *Franks v. Delaware,* —— U.S. ——, ——, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *See also* Kamisar, *Is the Exclusionary Rule an "Illogical" or "Unnatural" Interpretation of the Fourth Amendment?,* 62 Judicature 66 (1978).

**9.** *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**10.** True, *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977), states that "the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him" (footnote omitted). But I do not think that by the use of this language *Brewer* has sub silentio limited *Massiah.* Justice Stewart's opinion in *Brewer* begins by pointing out that the Court need not rely on *Miranda* because it was "clear" that the Sixth Amendment was violated. Then the Court implicitly concedes that Williams may not have been formally interrogated in the sense proscribed by *Miranda:* "Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him." 430 U.S. at 399, 97 S.Ct. at 1239.

The Court then points out that the state courts had proceeded as if the detective's speech had been "tantamount to interrogation." Throughout the rest of the opinion, the Court must be using "interrogation" to mean *both* formal interrogation and "deliberate eliciting" (which is "tantamount" to formal). The "interrogation" language may be ill chosen, but the Court's statement that the "clear rule" of *Massiah* is that the right to counsel attaches when the State "interrogates" could not by any stretch of the imagination be interpreted as a *limitation of Massiah.* The next sentence, indeed, to the effect that it "requires no wooden or technical application" of *Massiah* to conclude that Williams was entitled to counsel, shows that the spirit, as well as the substance, of *Massiah* is alive and well.

**11.** The *Massiah* Court said:

A few days later, and quite without the petitioner's knowledge, Colson decided to cooperate with the government agents in their continuing investigation of the narcotics activities in which the petitioner, Colson, and others had allegedly been engaged. Colson permitted an agent named Murphy to install

 

was interrogated.[12] Rather, what is critical is whether police conduct "deliberately elicited" information, not the precise manner in which the statements were obtained:

> We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the *Spano* [*Spano v. New York,* 360 U.S. 215, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)] case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, "if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent." 307 F.2d at 72–73.

*Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). As far as I know, *Massiah* is still the law.

*See Brewer v. Williams, supra,* 430 U.S. at 400–01, 97 S.Ct. 1232. *See* note 10 *supra.*

I would reverse and grant the writ unless appellant were retried.

---

a Schmidt radio transmitter under the front seat of Colson's automobile, by means of which Murphy, equipped with an appropriate receiving device, could overhear from some distance away conversations carried on in Colson's car.

On the evening of November 19, 1959, Colson and the petitioner held a lengthy conversation while sitting in Colson's automobile, parked on a New York street. By prearrangement with Colson, and totally unbeknown to the petitioner, the agent Murphy sat in a car parked out of sight down the street and listened over the radio to the entire conversation. The petitioner made several incriminating statements during the course of this conversation. At the petitioner's trial these incriminating statements were brought before the jury through Murphy's testimony, despite the insistent objection of defense counsel. The jury convicted the petitioner of several related narcotics offenses, and the convictions were affirmed by the Court of Appeals.

377 U.S. at 202–03, 84 S.Ct. at 1201 (footnote omitted).

12. The cases cited by the majority are distinguishable. In *United States v. Garcia,* 377 F.2d 321 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967), the officer to whom the incriminating statements were made was, in the majority's own words, "unaware of the existence of an indictment and was not seeking information about the crime charged in the indictment." *United States v. Hearst,* 563 F.2d 1331, 1347–48 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), also differs from this case since in *Hearst* the incriminating statements were made to Ms. Hearst's friend who was not working for the Government. Their conversation was simply recorded by government agents. The majority's reliance on *United States v. Fioravanti,* 412 F.2d 407 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), is also misplaced. In that case, where an informant was arrested along with the defendant who subsequently made incriminating statements to the informant, the purpose of arresting the informant was not to elicit admissions from the defendant but to protect his cover and his person. *See id.* at 413–14 n.15.