UNITED STATES of America,
Appellant,

v.

James W. MELANSON, et al.,
Defendants, Appellees.

No. 80–1445.

United States Court of Appeals,
First Circuit.

Argued Oct. 10, 1980.

Decided March 23, 1981.

As Amended on Denial of Rehearing
April 29, 1981.

Mandate Issued Oct. 15, 1981.

James F. X. Dineen, Asst. U.S. Atty., Boston, Mass., with whom Edward F. Harrington, U.S. Atty., Boston, Mass., was on brief, for appellant.

Michael J. Liston, Boston, Mass., with whom Douglas H. Wilkins and Palmer & Dodge, Boston, Mass., were on brief, for defendants-appellees.

Before COFFIN, Chief Judge, PELL * and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The United States appeals from the district court's order granting the motion of James Melanson to suppress statements that he made in the course of an initial hearing before a United States Magistrate.

I.

On February 7, 1980, James Melanson and Edwina Cyr were arrested by agents of the Bureau of Alcohol, Tobacco and Firearms. According to the government, the events leading up to their arrest were as follows: Earlier in the day, Melanson and Cyr arrived at a public parking lot in a car owned and driven by one Joseph Cooper.

Cooper got out of the car, leaving Melanson and Cyr inside, and was thereupon arrested by federal agents on firearms charges. When one of the agents, Timothy Ready, approached the vehicle, Melanson, who was sitting in the front on the far right, yelled at Cyr, sitting in the middle, who slid behind the wheel and started up the car. To avoid being hit, the government claims, Ready leapt onto the hood. Cyr then drove away, spilling Ready and precipitating a chase which ended with the apprehension of Cyr and Melanson. After their arrest, both individuals were informed of their *Miranda* rights.

The next day, Friday, February 8, 1980, Melanson and Cyr were formally charged with assaulting a federal officer in violation of 18 U.S.C. § 111 (1976)[1] and were taken before a United States Magistrate for an initial hearing on bail and appointment of counsel. At this hearing Melanson made the statements which, upon a motion in the course of subsequent criminal proceedings, the district court suppressed.

The hearing was attended by Melanson, Cyr, agent Ready and a government attorney, James Dineen. Neither defendant had counsel with them. The hearing opened with Ready signing and swearing to the complaints against the defendants. Cyr and Melanson were then sworn, informed of the charges against them and warned that "each of you have a right to remain silent, and anything you say can be used against you. You also have a right to counsel, and if you can't afford an attorney, the Court will appoint one for you." When first asked if they could afford lawyers, Cyr answered that she could not and Melanson said nothing. The magistrate asked Cyr to "sit down for a moment . . . and let me talk to Mr. Nelson [Melanson] for a moment."[2]

* Of the Seventh Circuit, sitting by designation.

1. 18 U.S.C. § 111 provides:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. Throughout the hearing, there persisted some confusion over Melanson's name, which he apparently had said was Nelson. The govern-

The magistrate asked Melanson a series of questions about his age, address and family, each of which Melanson answered. When asked for his attorney's name, Melanson replied,

"DEFENDANT NELSON [Melanson]: I don't have one, sir. I have to get one.

"THE COURT: You have your lawyer file his appearance or her appearance, whoever you hire, on or before Monday of this week.

"DEFENDANT NELSON: Yes, sir.

"THE COURT: And will you, Marshal, please be sure he has a chance to call his attorney."

Turning to the government attorney, the magistrate asked, "[W]as there any problem with this arrest?" Dineen briefly, related the government's version of the facts underlying the charges against Melanson and Cyr. The magistrate then broke off the inquiry and returned to questioning Melanson about his background. In response, Melanson stated his occupation and denied ever having been arrested before. The magistrate turned back to the government attorney to ask who the driver of the car had been. He was informed by Dineen that Cyr had driven at Melanson's urging. The magistrate then asked for a recommendation on Melanson's bail. Dineen brought out the confusion over Melanson's name, referred to the circumstances of the arrest, claimed Melanson's employer had described his attendance at work as "sporadic" and requested that bail be set at $50,000.

At this point, the magistrate said to Melanson, "All right, Mr. Nelson, or whatever your name is. You have a right to speak on your behalf. What do you say?" The following colloquy then ensued:

"DEFENDANT NELSON: I have nothing to say now. I was going to say, I didn't try to run him over or nothing. When I seen my friend getting stuffed in a trunk by two guys, not dressed in uniform. He did not flash a badge at me. He did not point a gun at me. He was on the hood.—(Unintelligible)—fired a shot at me. I don't care who it was. I'm getting the hell out of there. I am not getting shot at. That bullet went—(Unintelligible)—.

"THE COURT: Excuse me. Put this case on again for Monday morning after we get some details on this fellow. Is Monday time enough to get the details?

"MR. DINEEN: Yes, Your Honor. We will try and obtain more background information on him on the other names and try and run the other names.

"THE COURT: I figure once he gets his lawyer, he can talk to his lawyer more freely than he can here and maybe his lawyer can help us out better with some information. If they are bailable, I don't want to hold them. If they are not, we will hold them. It is as simple as that.

"MR. DINEEN: I'll certainly be available to talk to his attorney.

"THE COURT: All right. Let's set it down for 9:30 on Monday morning. This is for review of bail. Be sure your lawyer is here, Mr. Nelson.

"DEFENDANT NELSON: I got to get a lawyer, but now I am going to be staying here, I don't know if I am going to get one now.

"THE COURT: Well, you said—

"DEFENDANT NELSON: I can't get out to get one.

"THE COURT: Don't you have somebody in mind?

"DEFENDANT NELSON: I don't even know any lawyers.

"THE COURT: Do you want me to appoint a lawyer for you?

"DEFENDANT NELSON: Please.

"THE COURT: I will appoint one, but I am going to tell you. You pay him. If you can afford to pay him, you just said you could afford to pay him, so you are going to have to pay him.

"DEFENDANT NELSON: My boss seems to be throwing—I don't know what he is trying to pull.

ment questioned his identity early in the proceedings, but Melanson's true name was not confirmed until later.

"THE COURT: Well, let me appoint a lawyer that I think is capable that can handle your case, and then if you don't want him after Monday morning, you can get your own lawyer, but for the time being, I want a lawyer for each of you people here on Monday morning. I don't know what's going to happen on the next case, Edwina Cyr; but on this one here, I will appoint a lawyer temporarily at least.

"All right, be seated for a minute, Mr. Nelson; and we will see if we can get the lawyer on the phone to be sure he can be here. We want a lawyer that can be here."

Turning to Cyr, the magistrate questioned her much as he had Melanson. He asked about her age, address, occupation, family and arrest record. He requested Dineen to "give me the background here. Dineen responded by describing certain of the events preceding the arrest. During Dineen's narrative, Cyr interjected "No, no, no," and the magistrate remonstrated, "You are going to have your chance to speak. Just a moment." Thereafter more was said by Dineen, and also by agent Ready as to what allegedly had occurred. Finally, the magistrate said "All right" to Cyr, and she immediately launched into her own version. She said she had not known the agents were police, had thought Cooper was being kidnapped, had driven off when Melanson yelled "Put the car in reverse. Get out of here," and did not see the blue police lights until, later, she was told to pull over. At this point, Melanson, seated in the room, did something to attract the magistrate's attention; and the following colloquy immediately occurred during which Melanson uttered the remarks presently in issue.

"THE COURT: What is it?

"DEFENDANT NELSON: *It was my fault she took off and went back. I was more or less jumping down her throat.*

"THE COURT: This is Mr. Nelson speaking for the record.

"DEFENDANT NELSON: *She had nothing to do with the speed and taking off. I told her to do it, and I was scream-*

*ing at her. She usually does what I tell her to do. She ain't scared of me, so—as far as the light goes, the one they had in the car didn't even work, because I heard one of the cops say it to the other one when they were behind me.*

"THE COURT: Did you see the blue light on the car?

"DEFENDANT NELSON: *No, there wasn't a blue light. There was just one—as a matter of fact he only had one headlight.*" [Emphasis supplied.]

After Melanson's outburst, the magistrate went on for a short time with his interview of Cyr, before terminating the morning's proceeding. Although the record is unclear on this score, Melanson's appellate counsel advise us that at the end of this hearing on the morning of Friday, February 8, the magistrate set $50,000 bail for Melanson. Thereafter, on the following Monday morning, February 11, the magistrate, as he had promised, conducted a bail review hearing attended by Melanson and his newly appointed counsel. His bail was reduced to $25,000. Cyr had apparently been released on bail of $10,000 without surety after a resumed bail hearing on the afternoon of Friday, February 8.

Melanson subsequently moved to suppress the statements he made at the bail hearing. The district court granted the motion, but only as to those statements (italicized) which the government had expressed an intention of using in its case in chief. Any ruling on the admissibility of other of Melanson's remarks at the bail hearing was deferred. The court offered two grounds for its decision. First, relying on *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), it held that "in the absence of explicit cautions and full explanation by the magistrate of the possible incriminating effect of making statements at the bail hearing," Melanson was put to an impermissible choice between constitutional rights: "he might reasonably have believed that, had he chosen to remain silent, he would be impairing or impeding his rights to counsel, and to be free of excessive bail." Second, the court felt "that the

government ha[d] not proved by a preponderance of the evidence that the defendant understood his right to have counsel represent him in relation to bail as well as at trial and his right to remain silent until his attorney was present." It therefore found that Melanson had not waived his fifth and sixth amendment rights. Each finding, the court concluded, required suppression of the statements that the government sought to introduce.

## II.

Cases like this place a court at the confluence of several rights guaranteed to one in Melanson's situation by the Constitution and by statute. Arrested the previous day, Melanson came before the magistrate pursuant to Fed.R.Crim.P. 5(a), which requires an "arrested person" to be taken "without unnecessary delay before the nearest available federal magistrate" for an initial hearing. At this hearing the fifth amendment conferred upon Melanson the privilege against self-incrimination, see *United States v. Dohm,* 618 F.2d 1169, 1173 (5th Cir. 1980) (rehearing en banc), and the sixth amendment gave him a right to counsel.[3] Rule 5(c) of the Federal Rules of Criminal Procedure says that he was to be informed at the initial hearing "of the complaint against him and of any affidavit filed therewith, of his right to retain counsel, of his right to request the assignment of counsel if he is unable to obtain counsel, ... of the general circumstances under which he may secure pretrial release ... that he is

not required to make a statement and that any statement made by him may be used against him ... [and] of his right to a preliminary examination."[4] In addition, Melanson had a right to bail under the eighth amendment as implemented by Fed. R.Crim.P. 5(c), Fed.R.Crim.P. 46, and 18 U.S.C. § 3146.

While it is easy thus to catalog Melanson's rights, it is not so easy to give substance to these rights in the practical context of an initial hearing. Two of the objects of an initial hearing are appointing counsel, if needed, and setting bail; and to do this the magistrate needs some freedom to question the suspect even though counsel is not yet present. Indeed, the suspect's sixth amendment right to counsel may depend upon the magistrate's ascertainment of the suspect's needs and wishes with regard to an attorney. By the same token, respect for the suspect's right to have bail set expeditiously may cause the magistrate to proceed immediately—even without counsel in place—with the limited inquiry needed to set bail. It would not seem workable to adopt a flat rule forbidding the magistrate from asking any questions until counsel is appointed and arrives.[5] In so proceeding, however, the magistrate must be acutely sensitive to the suspect's rights and must curtail questioning if the individual situation so indicates. In the present case, the magistrate relied upon information obtained in his questioning of Melanson in deciding to appoint counsel. Melanson's

**3.** The Supreme Court has held that "a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (*quoting Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). *See also* cases cited in *Brewer,* 430 U.S. at 398–99, 97 S.Ct. at 1239. Apart from the Constitution, there is a statutory right to counsel "at every stage of the proceedings from [the] initial appearance before the United States Magistrate or court through appeal." 18 U.S.C. §§ 3006A(b), (c). A practical problem at this stage of a criminal proceeding is that a suspect like Melanson will often be

without an attorney; one of the magistrate's duties is helping him get one. *See infra.*

**4.** We need not decide whether Melanson was independently entitled to the warnings set out in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See United States v. Washington,* 431 U.S. 181, 186–88, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977); *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *Labbe v. Berman,* 621 F.2d 26 (1st Cir. 1980).

**5.** Subsequent proceedings, after counsel is appointed, will be conducted only in the presence of counsel. A similar hard and fast rule would be impractical as applied to an initial hearing.

outburst did not come until thereafter, when a codefendant, Cyr, was being questioned.

The price paid for this limited uncounselled inquiry is that from time to time, as was true in *Dohm, supra,* 618 F.2d 1169, difficulties will arise. Certain of the factors pertinent to the granting of bail, such as "the nature and circumstances of the offense charged" and "the weight of the evidence against the accused," *see* 18 U.S.C. § 3146, may inspire an accused to try to show, inadvisedly, that matters were different from what the government portrays, getting him into hot water as a result. Some judges have gone so far as to urge the blanket suppression of all such utterances, relying on the Supreme Court's language, in another context, that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976 (1968). In *Simmons* the Court held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt." 390 U.S. at 394, 88 S.Ct. at 976. By analogy to *Simmons,* it has been argued that all testimony at a bail proceeding should be immunized from future use. *See* Judge Goldberg's dissent in the panel opinion in *United States v. Dohm,* 597 F.2d 535, 544–56 (5th Cir. 1979). The district court relied on similar, though less sweeping, reasoning as the principal ground of its holding here.

For reasons articulated on an earlier occasion, *United States v. Miller,* 589 F.2d 1117 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), we reject the foregoing view. Not only is the right to bail less than absolute, *see United States v. Abrahams,* 575 F.2d 3 (1st Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978), a suspect need not surrender his fifth and sixth amendment rights in order to assert his right to bail: a magistrate can in virtually all cases honor an accused's right to remain silent or to be represented by counsel and still set appropriate bail. The circumstances of the offense charged and the weight of the evidence against the accused are obtainable from sources other than the suspect and are, in any case, only two "of many factors taken into consideration in establishing the terms of release in the discretion of the magistrate." *Miller, supra,* 589 F.2d at 1135 (citing 18 U.S.C. § 3146(b)). Most of the information required, as the Fifth Circuit said in *Dohm,* 618 F.2d at 1174, does not necessitate that the accused refer to the facts of the case. An accused's bail rights are not so contingent on his ability to speak without fear of the future use of his testimony that he must, by analogy to *Simmons,* be granted a blanket immunity from use of all statements made during an initial hearing. *Accord, Dohm, supra,* 618 F.2d at 1173–74. *See Flint v. Mullen,* 499 F.2d 100 (1st Cir.), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974) (*Simmons* held not to apply to a deferred sentence hearing). *Cf. United States v. Anderson,* 567 F.2d 839 (8th Cir. 1977) (applying *Simmons* to a hearing on motion to proceed *in forma pauperis* and appointment of counsel); *United States v. Branker,* 418 F.2d 378, 380 (2d Cir. 1969) (*Simmons* applied in same context as in *Anderson, supra*).

■ *Simmons* does not, therefore, in our view, mandate the blanket exclusion in a criminal trial of any and all remarks made by a suspect at an initial hearing. On the other hand, the sixth amendment right to counsel, as well as the fifth amendment privilege against self-incrimination, establish formidable conditions which must be satisfied before any uncounselled admissions "blurted out" in the course of such a hearing are to be allowed in at the later trial. We now turn to whether these conditions are a barrier to admissibility here.

### III.

■ In *Massiah v. United States,* the Supreme Court held that an accused was denied the protection of the sixth amendment "when there was used against him at his trial evidence of his own incriminating

words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). As construed by later cases, this holding has developed into a general rule excluding from use against a defendant at trial all statements obtained from him by the government *as a result of its failure to honor the accused's right to counsel.* Such failures have taken various forms. The sixth amendment has been found to be violated where the government has obtained statements from an accused in the absence of counsel through any form of interrogation, overt or surreptitious. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah, supra,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *United States v. Anderson,* 523 F.2d 1192 (5th Cir. 1975). Even without any attempt on the part of the government to elicit information, deliberate government involvement in circumstances that produce an incriminating response may offend the right to counsel. *See Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (per curiam); *McLeod v. Ohio,* 378 U.S. 582, 84 S.Ct. 1922, 12 L.Ed.2d 1037 (1964) (per curiam); *Hancock v. White,* 378 F.2d 479 (1st Cir. 1967).

The converse of the *Massiah* rule, of course, is that for purposes of the sixth amendment, incriminating statements made by an accused in the absence of an attorney *are* admissible against him at trial where not the product of government actions taken in derogation of his right to counsel. In deciding that the government has honored an accused's sixth amendment rights, courts have looked closely at the voluntariness of his statements. *See Wilson v. Henderson,* 584 F.2d 1185, 1190 (2d Cir. 1978), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979); *United States v. Hale,* 562 F.2d 336, 337–38 (5th Cir. 1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978); *United States v. Tucker,* 435 F.2d 1017, 1018 (9th Cir. 1970), *cert. denied,* 401 U.S. 976, 91 S.Ct. 1197, 28 L.Ed.2d 325 (1971); *United States v. De Loy,* 421 F.2d 900, 902 (5th Cir. 1970); *United States v. Garcia,* 377 F.2d 321 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967). The fact that the defendant has sought out a meeting with the government and spoken on his own initiative has often been accorded great weight. *See Hale, supra,* 562 F.2d at 337; *Tucker, supra,* 435 F.2d at 1018; *De Loy, supra,* 421 F.2d at 902. A related factor is the absence of government overreaching or surreptitious activity. *See id. But see Wilson, supra,* 584 F.2d at 1191. Where the government was not involved in obtaining statements from the accused in the absence of counsel, the statements have consistently been held admissible under the sixth amendment. *See United States v. Hearst,* 563 F.2d 1331, 1347–48 (9th Cir.), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Aloisio,* 440 F.2d 705, 710 (7th Cir.), *cert. denied,* 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed.2d 51 (1971); *United States ex rel. Baldwin v. Yeager,* 428 F.2d 182 (3d Cir. 1970), *cert. denied,* 401 U.S. 919, 91 S.Ct. 905, 27 L.Ed.2d 822 (1971); *United States ex rel. Milani v. Pate,* 425 F.2d 6, 8 (7th Cir.), *cert. denied,* 400 U.S. 867, 91 S.Ct. 109, 27 L.Ed.2d 107 (1970). Finally, if the accused was adequately apprised of his rights, admonished to exercise them, and nevertheless chose to speak, in effect waiving his constitutional privileges, courts have found no contravention of the right to counsel. *See Hale, supra,* 562 F.2d at 337–38; *United States v. Vasquez,* 476 F.2d 730, 733 (5th Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973); *United States v. Crisp,* 435 F.2d 354, 358–59 (7th Cir.), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *Tucker, supra,* 435 F.2d at 1018; *De Loy, supra,* 421 F.2d at 902.

Drawing on these several considerations, we cannot see how the United States in this case violated Melanson's sixth amendment right to counsel with regard to the statements now at issue.[6] The govern-

---

**6.** Our analysis treads between two alternative positions. On one hand, at least two circuits have drawn on language in *Brewer v. Williams,*

ment is not "made constitutionally deaf to the uncoerced, insistent, and untricked statement of a properly warned defendant." *De Loy, supra,* 421 F.2d at 902–03. Melanson did not make the challenged remarks in response to questioning. The remarks were spontaneously volunteered with a view to helping Ms. Cyr who was then testifying. At the time, Melanson; (1) had been told that an attorney was being procured for him; (2) had been advised that he had a right to counsel and to remain silent; (3) knew that Ms. Cyr, not himself, was being questioned; and finally (4) knew that the remarks in question could only harm his own position, and thus cannot have volunteered them in order to safeguard his own bail rights.[7]

In remarking that when the comments were volunteered "Melanson may reasonably have understood that his rights, as well as Cyr's, were still under consideration," the district court suggests that Melanson felt compelled to volunteer the questioned remarks in order to safeguard his own bail rights. Any such suggestion would, we think, be against the clear weight of the evidence and hence clearly erroneous. *See Holmes v. Bateson,* 583 F.2d 542, 552 (1st Cir. 1978). Chief Judge Coffin contends in his dissent that the district court's intimations on this point deserve deference because "the district judge held a hearing on the suppression motion, at which he could among other things assess Melanson's credibility and explore as he saw fit the facts relevant to an understanding of the events at the [bail] hearing." *See infra.* This argument might be persuasive had Melanson given testimony at the suppression hearing showing that he volunteered the remarks to benefit himself, but, as we explain at greater length below, he did not. To the contrary, the only reason Melanson advanced at the suppression hearing for having spoken out was that he wanted "to protect Mrs. Cyr," *see infra*—a reason quite opposed to that suggested by the judge. We note, moreover, that the transcript of the suppression hearing reveals virtually no "explor[ing]" by the district judge of the events at the earlier bail hearing. Further, the court made no express credibility findings nor did it make subsidiary findings indicating some basis for its apparent belief—opposed to Melanson's own testimony—that he was acting to protect himself. The trial court's ultimate analysis appears quite clearly to have rested not on evidence adduced at the suppression hearing but on its analysis of the transcript of the bail hearing. As the district judge was not present at the bail hearing, he was no better situated than we to assess what took place there.

Though it is true that the bail hearing was conducted jointly for Melanson and Cyr

*supra,* 430 U.S. at 400, 97 S.Ct. at 1240, to conclude that the sixth amendment only protects an accused from interrogation in the absence of counsel. *See Wilson v. Henderson, supra,* 584 F.2d at 1190–91 (2d Cir.); *Hearst, supra,* 563 F.2d at 1384 (9th Cir.). On the other hand, the Third Circuit has interpreted *Massiah* to require exclusion of *"all* post-indictment statements made to government agents absent proof of effective waiver of counsel." *Yeager, supra,* 428 F.2d at 184. (Emphasis added.) Our decisions have consistently held that deliberate elicitation of an incriminating statement in the absence of counsel is *not* a necessary precondition to violation of the right to counsel, but we have not, despite suggestions to the contrary, *see, e.g., Pate, supra,* 425 F.2d at 7; *Yeager, supra,* 428 F.2d at 184 & n. 9, gone so far as to adopt the per se rule of the Third Circuit. *See United States v. Monti,* 557 F.2d 899, 904 (1st Cir. 1977); *Grieco v. Meachum,* 533 F.2d 713 (1st Cir.), *cert. denied sub nom.*

*Cassesso v. Meachum,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *Hancock, supra,* 378 F.2d at 482.

7. Because we find no failure on the part of the government to honor Melanson's right to counsel, we need not go into the difficult question of what precisely must be shown to establish a waiver of rights when an accused makes an inculpatory statement *in response to* a question put by the magistrate at an initial hearing unattended by defense counsel. As in other cases of waiver, the answer must doubtless "depend, in each case, upon the particular facts and circumstances surrounding that case...." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Cf. *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979) (applying the same standard to determine waiver of fifth amendment rights).

and the magistrate twice shifted his questioning from one defendant to the other, the proceedings as to each were adequately separated. While no final decision regarding Melanson's right to counsel and to bail had been handed down prior to the questioning of Cyr that sparked Melanson's comments, the magistrate had temporarily suspended Melanson's case: he had announced that counsel would be appointed for Melanson; and that bail was to be reviewed at 9:30 a.m. Monday morning with counsel present. There is nothing whatever in the record to support a finding that Melanson understood the interview with Cyr as somehow directed at him and so involving his rights. Melanson's own testimony in the district court makes it clear that Melanson's outburst was *not* prompted by concern for his right to counsel and bail. On cross-examination by the government at the suppression hearing, Melanson was asked,

"Q. Did anyone force you to stand up and make the statements you made during the hearing?

"A. No.

"Q. Was it something you wanted to do?

"A. Yes, sir.

"Q. Why did you want to do it?

"A. To protect Mrs. Cyr."

His explanation, unlike the district court's, is consistent with the thrust and content of the statements. Melanson seems to have believed that by shouldering blame for the incident with the government agents he would help Cyr, either on the matter of bail or otherwise. He could hardly have believed the statements would help him in the same or in any way.

We also believe to be against the clear weight of the evidence the district court's finding that "the government has not proved by a preponderance of the evidence that the defendant understood his right to have counsel represent him in relation to bail as well as at trial and his right to remain silent until his attorney was present." Melanson was informed of his rights, including the right to counsel, upon arrest. The initial hearing was held the day after his arrest and at the beginning he was formally informed of his right to counsel. Thereafter, prior to Melanson's later outburst, the appointment of counsel for him was discussed at length. Thus the magistrate interrupted Melanson's exculpatory response to the government's description of his arrest saying, "Excuse me. Put this case on again for Monday morning after we get some details on this fellow." The court went on to say, "I figure once he gets his lawyer, he can talk to his lawyer more freely than he can here and maybe his lawyer can help us out better with some information. If they are bailable, I don't want to hold them. If they are not, we will hold them.... All right. Let's set it down for 9:30 on Monday morning. *This is for review of bail. Be sure your lawyer is here, Mr. Nelson.*" [Emphasis supplied.]

At this point Melanson said he didn't have a lawyer. Eventually, after further discussion of obtaining counsel, the court finished with Melanson as follows:

"THE COURT: Well, let me appoint a lawyer that I think is capable that can handle your case, and then if you don't want him after Monday morning, you can get your own lawyer, but for the time being, I want a lawyer for each of you people here on Monday morning. I don't know what's going to happen on the next case, Edwina Cyr; but on this one here, I will appoint a lawyer temporarily at least.

"All right, be seated for a minute, Mr. Nelson; and we will see if we can get a lawyer on the phone to be sure he can be here. We want a lawyer that can be here,"

The upshot of this extended discussion of Melanson's need for, and ability to obtain, representation was that his right to counsel was then operative and would be fully respected by the magistrate. We think it was made abundantly clear that Melanson's bail hearing was to resume later with counsel present. Melanson's insistence upon intervening for the purpose of exculpating Ms. Cyr, could only have reflected a personal

desire to speak in the absence of counsel. It was in no way elicited by the government nor, as we have said, did it derive from some misguided effort by the uncounselled suspect to assert his own rights. In such circumstances—given Melanson's knowledge that efforts were under way to procure counsel—we cannot see that the government was guilty of denying him the right to counsel merely because it left him seated in the room while a fellow suspect was being questioned, there being no design nor reason to expect that Melanson would interrupt. *Cf. Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682 at 1688, 64 L.Ed.2d 297 (1980) ("interrogation" under *Miranda v. Arizona* defined to include "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnotes omitted)).

## IV.

Presumably as an independent basis for granting Melanson's motion to suppress, the district court found that the government did not meet its "heavy burden" under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), of showing that in making the statements at issue Melanson voluntarily, knowingly and intelligently waived his fifth amendment right to remain silent.[8] Again, our examination of the record indicates that this conclusion is against the clear weight of the evidence.

■ Since *Miranda,* the Supreme Court has developed the parameters of the showing of waiver required of the government:

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said

in *Miranda,* mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

*North Carolina v. Butler, supra,* 441 U.S. at 373, 99 S.Ct. at 1757 (footnote omitted). To decide this issue, courts must look "into the totality of the circumstances surrounding the interrogation," *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979), including the age, experience, education, background, intelligence and conduct of the defendant. *See Fare, supra,* 442 U.S. at 725, 99 S.Ct. at 2572; *Butler, supra,* 441 U.S. at 374–75, 99 S.Ct. at 1758. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

■ We have already determined that Melanson's statements were not improperly compelled by the magistrate's questioning of Cyr or Melanson's concern for his sixth and eighth amendment rights. On the contrary, they were volunteered out of concern for a co-defendant. The district court was also troubled, however, by "the absence of explicit cautions and full explanation by the magistrate of the possible incriminating effect of making statements at the bail hearing." To be sure, the magistrate's warnings were minimal, but an appraisal of the totality of the circumstances of this case shows that Melanson nevertheless understood his fifth amendment rights and competently waived them. He was informed of his rights upon arrest and again at the outset of the bail hearing. He had previous experience with being arrested and charged. When given a chance to speak at the bail hearing immediately after the ques-

---

8. We pass by the question whether *Miranda* would apply on these facts under the Supreme

Court's holding in *Rhode Island v. Innis, supra.*

tion of his identity arose, he chose not to address the issue; rather, he said, "I have nothing to say now," but then offered an exculpatory version of the events leading up to his arrest, apparently in response to an inculpatory version related by the government attorney.[9] As we have elsewhere observed, selectively answering questions may demonstrate "not only . . . a knowledge of the right to remain silent but also the intelligence and will to vindicate that right." *Miller, supra,* 589 F.2d at 1135. The government has met its burden of showing that Melanson's statements manifested a voluntary, knowing and intelligent waiver of his right to remain silent. Therefore, the admission of those statements against him at trial would not violate the fifth amendment.

*Reversed.*

COFFIN, Chief Judge (dissenting).

Because I see the district court's two salient fact findings as not being clearly erroneous, I conclude that this case is distinguishable in two significant respects from *United States v. Miller,* 589 F.2d 1117 (1st Cir. 1978). Because I see no persuasive reason to expand the scope of *Miller,* I would affirm the judgment below.

The first of the two findings is that when Melanson made his "volunteered" remarks, he "may reasonably have understood that his rights, as well as Cyr's, were under consideration." By "rights" I think it is clear from the use of the plural and from later remarks concerning the scope of Melanson's understanding that the court was referring to both the right to have counsel appointed and the right to have bail. If indeed Melanson's outburst could supportably be found to have been stimulated by a desire to persuade the magistrate that he should have both counsel and bail, or by a

view that these rights could be served only by speaking up, we arrive at the point where Melanson could assert certain constitutional rights only by sacrificing his right to remain silent.

This fact would have no legal significance if Melanson had waived his Fifth Amendment right not to have his own statements admitted against him at trial. But the district court's second factual finding precludes a finding of waiver: the court found that one of the prerequisites to a valid waiver, an understanding by Melanson of his right to remain silent, was not proven by a preponderance of the evidence. If this finding is not clearly erroneous, then the question this case presents is whether a non-waived Fifth Amendment right is unduly burdened by the admission at trial of uncounselled statements made in furtherance of two other constitutional rights. Seen in this light, this case differs in two important respects from *United States v. Miller, supra,* a holding which in my view should not be lightly extended. For the reasons to be stated I think the findings should not be set aside.

First, I think many indications support the district court's finding that Melanson may reasonably have understood that his own Sixth and Eighth Amendment rights were still at issue. The court acknowledges several factors: the bail hearing was conducted jointly for the two defendants; it shifted back and forth from one to the other earlier; no final decision had been reached in Melanson's case; and the magistrate had merely told Melanson to "be seated for a minute". I think other factors significantly buttressing the district court's conclusion can be adduced as well: the hearing as a whole had focused intensively at numerous points on the merits of the government's case; Cyr's testimony imme-

---

**9.** Melanson argues that the statements which the government seeks to introduce were a "clarification" of these remarks which, he claims, were involuntary. He concludes that the later statements must therefore also be found to have been compelled. However, we reject his characterization of the relation between the statements. In intent, the two are quite differ-

ent—the thrust of the earlier is exculpatory, that of the latter inculpatory. If anything, Melanson's initial demonstration of his ability to seek to exonerate himself, even when questioned by the magistrate, suggests that his later decision to interrupt the proceedings and incriminate himself was made *despite* (rather than because of) his previous remarks.

diately preceding Melanson's outburst had mentioned and arguably incriminated Melanson; Melanson's own statements are entirely consistent with his defense, and indeed may very well be seen as directly exculpatory insofar as he denied seeing any blue lights on the police cars; Melanson's assertion that he intended to aid Cyr is in no way inconsistent with the view that he spoke in an effort to further his own interests; and, finally, the magistrate continued to discuss, and indeed appears to have set, Melanson's bail *after* his outburst, despite earlier talk of a delay until counsel was provided. In addition, of course, the district judge held a hearing on the suppression motion, at which he could among other things assess Melanson's credibility and explore as he saw fit the facts relevant to an understanding of the events at the hearing. While I think the cumulative impact of these indicia is rather overwhelming, I need not go nearly so far; all I say here is that the court's opinion seems vulnerable to me in saying that the finding below is clearly erroneous.

Second, I find considerable evidence to support the district court's finding that the government did not prove by a preponderance of the evidence that Melanson understood "his right to remain silent until his attorney was present". Melanson never affirmatively indicated any understanding of such a right, not to mention an intent to waive it; he testified that he had not knowingly waived any rights in signing a form the day before; the magistrate's statement of Melanson's rights was a terse, minimal outline, without elaboration; the statement included no specific discussion of bail hearings, and was immediately followed by questioning relevant to the bail determination; the magistrate's questioning and the agent's testimony went quickly and frequently to the events Melanson's outburst later addressed; and more intangibly—and a matter on which the district court's later opportunity to observe the witness might give it some advantage—Melanson seems possibly confused or intimidated throughout the hearing: not answering when first asked if he can afford a lawyer, then agree-

ing to have one in court in a few days, and finally saying he needed a court-appointed lawyer. I would concede that the extent of Melanson's understanding as to his right to remain silent is a close question. But where, as the district court noted, the government bears a heavy burden in establishing waiver, where the trial court has found the government to have failed to carry such a burden, and where that court has observed the defendant whose credibility is centrally in issue, an appellate court needs heavy artillery to demonstrate a clearly erroneous finding.

Taking these facts to be as found by the district court, I see this case as different in two significant respects from *Miller*. First, while Melanson might reasonably have felt that his right to counsel as well as his right to bail was at stake at the time he made the statement in question, Miller already had counsel by the time the bail hearing began. 598 F.2d at 1135 n. 17. Thus Melanson was uncounselled at the time of his statements, and also could have thought his Sixth as well as Eighth Amendment rights jeopardized by a failure to speak. For these reasons Melanson's lack of counsel is significant irrespective of whether his Sixth Amendment rights themselves were violated in this case. Second, we have here an explicit finding by the district court to the effect that Melanson did not intend to waive any rights, a finding supported by the evidence; in *Miller,* by contrast, the district court had made no finding as to waiver, and we rejected Miller's argument that no waiver had been intended as "untenable". 598 F.2d at 1135 n. 17. Thus Melanson's Fifth Amendment rights are still very much at stake, and the question whether they would be unduly burdened is at issue in a way it could not be in *Miller.*

I think these distinctions significant—and I think the relevant constitutional and policy considerations suggest that they are at least enough to dictate that we not expand *Miller* to cover the conflict of rights involved here. Where a defendant, particularly one assisted by counsel, knowingly waives his right not to have his statement

used against him at trial, no significant policies argue against allowing such use. Where, by contrast, the defendant is unassisted by counsel and no such knowing waiver has been tendered, a very different balance obtains. I have serious reservations as to whether the rather attenuated interest in law enforcement served by allowing the incriminating statements into evidence (i.e., a reliance on bail-hearing statements to obtain convictions) really is sufficient to offset the danger to the relatively palpable and immediate bail and counsel rights at stake. I recognize that a defendant's own testimony may not be indispensable to a bail determination, but it does seem both that the facts of an incident are highly important to such a determination and that the only description of an alleged offense likely to reach a magistrate in the absence of a defendant's testimony is that of the prosecution—both of which, of course, are true here. Indeed, barring the subsequent admissibility of defendant's bail-hearing statements in a case such as this would allow a full and expeditious inquiry to take place at bail hearings without chilling the assertion of important rights at them. See United States v. Dohm, 597 F.2d 535, 544 (5th Cir. 1979) (Goldberg, J., dissenting); id., 618 F.2d 1169 (5th Cir. 1980) (en banc) (holding statements made at bail hearing inadmissible on ground that no knowing waiver of Fifth Amendment rights by defendant had been shown); Note, United States v. Dohm and the Compelled Election Between the Right to Remain Silent and the Right to Reasonable Bail, 94 Harv. L.Rev. 426 (1980); see generally Note, Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings, 76 Colum.L.Rev. 674 (1976).

Although these considerations do not induce me presently to disavow my own opinion for the court in Miller, they take away all taste for expanding it. The relative harmlessness of the statements at issue in this case and the arguably altruistic motivation of the defendant may make admissibility seem innocuous here, but I think such a perception clouds the potentially significant respect in which the court extends a limitation on important constitutional rights. I would hold that, at least where both Sixth and Eighth Amendment rights are arguably at stake, and where a knowing waiver of Fifth Amendment rights is not clearly proven, a defendant's statements at a bail hearing may not be admitted into evidence against him at trial.

## MEMORANDUM AND ORDER

In their Petition for Rehearing and Rehearing En Banc, counsel for appellee have pointed out certain factual inaccuracies in our opinion of March 23, 1981. There, we indicated that the initial hearing for Melanson and his codefendant, Edwina Cyr, began on the morning of Friday, February 8, 1980, recessed, and then resumed in the afternoon, with bail being set for the defendants only at the conclusion of the afternoon portion of the proceedings. Counsel for appellee now point out that in actuality bail in the amount of $50,000 was set for Melanson at the end of the hearing on the morning of February 8. We are told that Melanson did not come back before the magistrate until the following Monday, February 11, at which time, with counsel present, bail was reviewed and reduced to $25,000. (Our description of the timing of the proceedings is apparently correct as to Cyr, who came back before the magistrate on the afternoon of Friday, February 8, with counsel present. Bail was then set for her at $10,000 without surety.)

As counsel recognize, the inaccuracies in our opinion are the result of incorrectly dated transcripts in the record on appeal. The record of the morning and afternoon hearings on February 8, as well as the later hearing on February 11, comprise a single transcript bearing the date February 8, 1980. A reading of the transcript does not expose the inaccuracy of that date. The problem is now pointed out to us for the first time.

The Court appreciates having these matters brought to our attention. However, they do not undermine the cornerstone of

our opinion, which is the fact that Melanson's "blurted out" remarks were knowingly volunteered in an effort to assist a codefendant and were not improperly elicited or uttered in response to a perceived need to assert his own rights.

We accordingly deny the Petition for Rehearing and make the following amendments to our opinion of March 23, 1981:

[Editor's Note: Corrections were made in accordance with the order.]

COFFIN, Chief Judge, does not join in the Memorandum and Order. He would vote to grant the Petition for Rehearing.