**UNITED STATES of America**

**v.**

**James P. PAVELKO John C. Kenney.**

**John C. Kenney, Appellant.**

**No. 92–3299.**

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1993.

Decided April 27, 1993.

---

Thomas A. Crawford, Jr., Pittsburgh, PA (argued), for appellant.

Thomas W. Corbett, Jr., Bonnie R. Schlueter (argued), Office of U.S. Atty., Pittsburgh, PA, for appellee.

Before: MANSMANN, NYGAARD, Circuit Judges, and DALZELL, District Judge *.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

### I.

On July 25, 1991, a man wearing a baseball cap, mask and black gloves entered the Integra Bank branch office in Charleroi, Pennsylvania, brandished a small silver handgun and demanded the money from each teller's cash drawer. John C. Kenney, and his co-conspirator, James Pavelko, were indicted by a federal grand jury for this robbery. The three count indictment charged Kenney with conspiring to rob the bank; taking $9,919.01 by force; and using a handgun to perpetrate the robbery. Pavelko pleaded guilty and agreed to testify against Kenney. Kenney was tried and found guilty.

When arrested, Kenney was given his *Miranda* warnings and properly informed of both his right to remain silent, and his right to counsel, court appointed if he qualified. He then appeared before a United States Magistrate Judge and was again informed of his rights, this time under Fed.R.Crim.P. 5(c).

Kenney requested court-appointed counsel, and in response to questions by the court to determine if Kenney was qualified, Kenney replied that "he had not been employed for the past year." He was also required to complete the CJA 23 financial affidavit form which asked, "Have you received in the past 12 months any income from a business, pro-fession, or other form of self employment or in the form of rent payments, interest, dividends, retirement, annuity payments or another source?" [1] Kenney answered "No." The Magistrate Judge approved Kenney's request and appointed counsel to represent him.

At trial, the government sought to show partially by circumstantial evidence, that Kenney's source of funds for cash purchases was the bank robbery and not a legitimate source. It called an FBI agent to testify about Kenney's assertions to the Magistrate Judge. Kenney's attorney objected:

> Your Honor, we think it's appalling that the government would attempt to offer a financial affidavit which the defendant filled out in order to obtain an attorney and try to use it against him in a trial. We feel that is something that he was compelled to do in order to obtain counsel and therefore, would not be a voluntary statement while he was in custody.

The court permitted the agent to testify. When the government offered to introduce the certified copy of Kenney's CJA financial affidavit, his attorney again objected. The trial court again overruled the objection and admitted the financial affidavit into evidence.

Kenney raises only one meritorious issue on appeal, whether the district court violated his Fifth Amendment privilege against self-incrimination by admitting the testimony of the FBI agent and the CJA 23 financial affidavit into evidence. [2] Whether admitting this evidence violated Kenney's constitutional rights is a legal issue subject to plenary review. *Tudor Dev. Group Inc. v. United States Fidelity Guar. Corp.*, 968 F.2d 357, 359 (3d Cir.1992). We conclude that the district court erred, but that the error was harmless beyond a reasonable doubt.

---

* Honorable Stewart Dalzell, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The form requires a defendant who requests court-appointed counsel to provide information revealing assets, debts, employment and monthly earnings.

2. Kenney raises three other issues: (1) whether the district court erred by admitting testimony of uncharged criminal conduct: (2) whether it erred by admitting evidence obtained from an illegal search and seizure; and (3) whether it erred by admitting in court identifications that were alleged tainted by overly suggestive photographic displays. We have carefully reviewed each issue and conclude that they are meritless.

## II.

We need not dwell long on the issue of error. Indeed, the district court would have erred by admitting either the affidavit or the testimony of the agent. A specific objective of an initial appearance is to appoint counsel. We do not dispute that to accomplish this objective, the magistrate judge needs latitude to question the defendant—even though, obviously, counsel is not usually present. Indeed, the Criminal Justice Act of 1964 specifically provides:

The United States Magistrate, or the court shall advise the person that he has the right to be represented by counsel and that counsel will be appointed to represent him if he is financially unable to obtain counsel. Unless the person waives representation by counsel, the United States Magistrate or the court, *if satisfied after appropriate inquiry* that the person is financially unable to obtain counsel, shall appoint counsel to represent him.

18 U.S.C. § 3006A(b) (emphasis added).

█ The error was not committed by the Magistrate Judge when he questioned Kenney. The error was committed by the district court when it admitted the testimony and the financial affidavit, and thus created a tension between Kenney's Fifth and Sixth Amendment rights. It in effect conditioned the free exercise of one constitutional right upon waiver of the other. If permitted, this practice would require defendants like Kenney to choose between the privilege of self incrimination and the right to court-appointed counsel.

The Supreme Court has held in a similar context that placing an accused in such a dilemma and creating this tension between the free exercise of rights is constitutional error. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), Simmons had moved to suppress the contents of a suitcase arguing that it was seized in violation of his Fourth Amendment rights. He was required to admit that he owned the suitcase to show standing to assert his Fourth Amendment argument. When his efforts to suppress the evidence failed, the government used his admission of ownership against him at trial. The Supreme Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394, 88 S.Ct. at 976.

Although *Simmons* concerned violations of the Fourth and Fifth Amendments, the Court's holding is applicable here. The right to counsel and the privilege against self-incrimination are no less important than the right to be free from unreasonable searches and seizures. In *United States v. Branker*, 418 F.2d 378 (2d Cir.1969), the Court relied on *Simmons* to deem it improper for the trial court to admit a defendant's testimony from his initial hearing:

We are of the view that the government should not be permitted to use as part of its direct case any testimony given by a defendant at a hearing where he is seeking forma pauperis relief or the assignment of counsel on the ground of his financial inability to ... secure counsel. The defendant should enjoy his constitutional rights to counsel and to appeal and the means of supporting his assertion of these rights by his own testimony without running the risk that thereby he may be incriminating himself with respect to the charges pending against him.

*Id.* See *United States v. Gravatt*, 868 F.2d 585, 590–91 n. 9 (3rd Cir.1989).

Indeed, some courts have invoked a "blanket suppression" of all statements made at the initial appearance, relying on the Supreme Court's instruction that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." See *United States v. Melanson*, 691 F.2d 579, 584 (1st Cir.1981). See also *United States v. Dohm*, 597 F.2d 535, 544–56 (5th Cir.1979) (Goldberg, J., dissenting).

We believe that a "blanket suppression" both extends the holding of *Simmons* and is not necessary. We share with the Court of Appeals for the First Circuit the view that:

*Simmons* does not ... mandate the blanket exclusion in a criminal trial of any and all remarks made by a suspect at an initial hearing. On the other hand, the Sixth Amendment right to counsel, as well as the Fifth Amendment privilege against self incrimination, establish formidable condi-

tions which must be satisfied before any uncounselled admissions "blurted out" in the course of such a hearing are to be allowed in at the later trial.

*Melanson,* 691 F.2d at 584.[3] Clearly, if the "formidable conditions" imposed by the Fifth and Sixth Amendments are not met, the district court errs by admitting testimony that includes involuntary admissions made by a defendant at his initial appearance.[4] We need not determine, however, whether these "formidable conditions" were satisfied here. Even assuming they were not, we conclude that such error was harmless beyond a reasonable doubt.

### III.

### A.

■ The Supreme Court created a harmless error rule for admitting evidence obtained in violation of defendant's constitutional rights in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Court there elaborated on a standard first announced in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), namely, "whether there is a reasonable probability that the evidence complained of might have contributed to the conviction." *Fahy,* 375 U.S. at 86–87, 84 S.Ct. at 230–231. The Supreme Court in *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) divided errors into two categories: trial errors and structural defects. *Id.* at ——, 111 S.Ct. at 1264–65. A "harmless error" analysis may be applied to trial errors, whereas any structural defects are subject to an automatic reversal. *Id.* at ——, 111 S.Ct. at 1265.

The Court defined "trial errors" as errors in the trial process occurring in the presentation of the case that can be quantitatively assessed. *Id.* at ——, 111 S.Ct. at 1264. "Structural errors," on the other hand, are defects that affect the framework of the trial and infect the truth-gathering process itself. *Id.* at ——, 111 S.Ct. at 1265. "Structural defects" deprive the criminal trial of constitutional protections without which the

> criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.

*Id.,* citing *Rose v. Clark,* 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Here, we are presented with a "trial error," because the error directly touches upon the presentation of the case, can easily be assessed quantitatively and does not stem from the framework or conduct of the trial itself. So we must analyze the evidence to determine whether the error was harmless.

### B.

■ In a harmless error analysis, the prosecution must carry the burden of showing that the error complained of was indeed harmless. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. The test is whether the evidence is so overwhelming that it is beyond reasonable doubt that the verdict would have been the same without the improper evidence. *Yates v. Evatt,* —— U.S. ——, ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). To decide that an error did not determine the verdict is to conclude that the error was unimportant in light of everything else the jury considered on the issue in question. *Id.* Here we must decide whether there was evidence of sufficient quality and quantity presented at trial

---

**3.** The *Melanson* Court determined that a suspect need not surrender his Fifth and Sixth Amendment rights to assert his right to bail. Cf. *United States v. Anderson,* 567 F.2d 839 (8th Cir.1977) (applying *Simmons* to a hearing on a motion to proceed in forma pauperis and appointment of counsel and excluding incriminating comments made during this hearing).

**4.** A magistrate judge must remain "acutely sensitive to the suspect's rights and must curtail questioning if the individual situation so indicates." *Melanson,* 691 F.2d at 583. In prosecutions where personal or corporate finances are at issue, law enforcement officials and courts should be keenly aware that any inquiry which directly or indirectly concerns the defendant's income, assets, or general financial position may elicit incriminating responses. In this situation, officials must exercise appropriate precautions to protect the defendant's rights, including but not limited to granting use immunity to the defendant in exchange for information of personal finances or reviewing such information *in camera* and then sealing the information afterwards. See *Gravatt,* 868 F.2d at 590.

to support the jury's verdict and, hence, a conclusion of harmless error.

### C.

 Contemporaneous with the robbery, Rhonda House passed the bank and noticed that something was wrong. She testified that she saw a black man wearing a baseball cap and with a towel wrapped around his face get out of a car and head toward the bank. She, of course, concluded that the man intended to rob the bank, went to the nearest telephone and called the police. She then returned to her car to follow the robber when he left the bank.

William Dawson testified that he saw a black man wearing a mask run out of the bank carrying a container. When Dawson stopped at a telephone, he saw the robber, who was driving a red Camaro, pull into the "Colonel Sanders" parking lot and stop next to a blue car. He saw a white, heavy-set male get out of the blue car as the black man got out of the red Camaro. Dawson also saw the two men pick up money the black man spilled from his container onto the ground. They then drove off together in the blue car.

In the meantime, Ms. House had also followed the red Camaro to the restaurant's parking lot. She suspected that the robber had switched to the blue car, which was leaving the parking lot, and wrote its license plate number. Both House and Pavelko testified that as the robbers drove away, the police sped by them toward the bank.

Pavelko testified that he and Kenney were the men who robbed the bank, and that after dropping Kenney off, Pavelko went to the pizza shop where he worked and hid his share of the robbery proceeds. Soon, however, the police arrived at the pizza shop and questioned him. After questioning, Pavelko admitted that he was the getaway driver in the robbery and identified Kenney as the robber.

Meanwhile Kenney, posing as "Robert Fox," spent a considerable amount of cash on extravagant purchases. For example, on August 15, 1991, he paid $1800.00 in cash to rent a limousine to transport him from Harrisburg, Pennsylvania to St. Paul, Minnesota. On September 7, 1991, Kenney paid $4169.48

in cash for a 20 inch gold chain and $298.20 for a Wittnauer watch.

Kenney testified in his own defense and tried to explain away the lavish expenditures. Reading his testimony as a whole, particularly when measured against Pavelko's testimony and the rest of the case presented to the jury, we believe there is no reasonable probability that the outcome of this case would have been different had the district court rejected the evidence which the government secured at the initial appearance.

### IV.

We conclude that the court erred when it admitted Kenney's financial condition answers into evidence. We will affirm Kenney's conviction, however, because the district court's decisions did not change the verdict and are harmless.