**UNITED STATES of America, Appellant,**

v.

**Pasquale G. BARONE, a/k/a Patsy, a/k/a Anthony Capone, Defendant, Appellee.**

**No. 91–2128.**

United States Court of Appeals, First Circuit.

Heard April 9, 1992.

Decided July 6, 1992.

Carole S. Schwartz, Special Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., and Gregg L. Sullivan, Asst. U.S. Atty., Boston, Mass., were on brief for appellant.

Bernard Grossberg, Boston, Mass., for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and YOUNG,* District Judge.

* Of the District of Massachusetts, sitting by designation.

1. In so doing, we rely heavily on the district court's description of the relevant events. Although the government challenges certain of the court's inferences, it does not seriously dispute the court's findings on what actually occurred during the four days at issue.

COFFIN, Senior Circuit Judge.

The government appeals from a district court order suppressing a series of post-arrest statements made by defendant Pasquale Barone. The court found that Barone's right to cut off questioning about a Boston homicide was not "scrupulously honored" by law enforcement officers and that, consequently, they had violated his Fifth Amendment right to remain silent. *See Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). The court also found, however, that Barone made his statements voluntarily. The government argues that, in light of the voluntariness finding, the court should not have suppressed the statements. For reasons we explain below, we uphold the order.

### I.

In light of their importance to the claim on appeal, we shall relate the facts of Barone's arrest and subsequent contacts with law enforcement officers in some detail.[1]

At approximately noon on Friday, July 22, 1988, Barone was arrested in an Ohio supermarket where he worked as a stockboy. Although the Massachusetts warrant for his arrest was issued on a charge of unlawfully carrying firearms, the government primarily sought Barone at that time to solicit his cooperation in the investigation of a 1985 murder in Boston. The government believed that Barone had murdered James Limoli upon orders from Vincent Ferrara, a powerful organized crime figure whom the government had been investigating for some time.[2]

Four law enforcement officers participated in Barone's arrest: Ohio FBI Agent Michael Bartley, Lieutenant Ralph Gale of the Lorain County, Ohio, Sheriff's Depart-

2. Barone fled Boston in 1985 because he believed Ferrara planned to have him killed as a result of a dispute over missing money connected to the Limoli death. In November 1985, less than two weeks after Limoli's murder, security personnel at Boston's Logan Airport detected two guns in Barone's luggage as he prepared to board a flight to North Carolina. Barone evaded apprehension and remained a fugitive until his arrest at the Ohio supermarket.

ment and a pair of Boston police detectives, Charles Fleming and William Dickinson, who also were members of the United States Organized Crime Strike Force. On the way to the police station after the arrest, as Fleming began to advise Barone of his *Miranda* rights, the defendant started to recite them himself, stating, "I have a right to remain silent and I have a right to an attorney." The officers added that anything the defendant said could be used against him, and that if he began talking, he could stop at any time. The district court concluded that this exchange provided Barone with "minimally adequate advice of his *Miranda* rights," Order at 24, noting that he would have received a more elaborate description of those rights had he not claimed familiarity with them.

The issue of Vincent Ferrara's role in the Limoli murder was first raised in the car. According to the officers, Barone initiated the conversation by telling them, "you don't want me, you want Ferrara." The defendant testified, however, that Fleming introduced the topic, telling him that, "we really don't want you. We want Ferrara." The district court made no explicit finding on this conflicting testimony.

The officers and Barone arrived at the Lorain County Sheriff's Department at about 12:30 p.m. Barone was booked, asked some background questions and then placed in a holding cell. Within thirty minutes of his arrival at the jail, Bartley and Dickinson went to speak with him at the holding cell. Without repeating the *Miranda* warnings, the officers told the defendant that they knew he was involved in the Limoli homicide and that they wanted to discuss the murder. Barone responded by saying there were no witnesses, no gun had been found, and he queried, "why would I kill my best friend?" The officers pressed the defendant to talk, but he said he did not want to discuss the Limoli matter until he got back to Boston. The officers recognized this as an assertion of the

right to remain silent about the murder, and they left.

A short time later, Lt. Gale spoke with Barone. Gale, who knew that Barone had refused to talk to Bartley and Dickinson, urged him to cooperate with the Boston authorities. Gale discussed the Charles Street Jail in Boston, where Barone would be sent, noting that it generally was not a safe place and that Barone would be in particular danger there—an implicit reference to the danger posed by Ferrara.[3] Barone told Gale that the case against him would have to be proven in court, that he and Ferrara knew what to expect from each other, and that he would take care of himself.

The district court found that Gale's contact with Barone at this time was designed "to pressure Mr. Barone to abandon the assertion of his right to remain silent and to influence Mr. Barone to cooperate." Order at 27. As a result, the district court found that Gale had failed to "scrupulously honor" Barone's right to remain silent. The court viewed this exchange between the officer and defendant as a reassertion by Barone of his right to remain silent about the Limoli murder.

Less than two hours later, Bartley and Dickinson made a third attempt to solicit Barone's cooperation in the Limoli investigation. Once again, they gave no additional *Miranda* warnings. And once again, Barone told the officers that he wanted to wait until he got back to Boston to assess the case against him before deciding whether to talk about Limoli. The officers stopped questioning on that subject, but did go on to discuss other matters.

Further contact with Barone did not occur until 7 p.m. the next evening. In the interim, Dickinson spoke with his partner in Boston, Detective Martin Coleman, advising him of Barone's arrest and refusal to discuss the Limoli murder. Dickinson told Coleman that Barone felt no compulsion to cooperate because he believed au-

---

**3.** The government claims that the district court erroneously found that Gale, rather than Barone, referred explicitly to the danger from Ferrara. We read the district court's order to say that Gale emphasized the danger at the jail and that Barone perceived the danger to be from Ferrara. *See* Order at 27.

thorities had no witnesses or evidence against him. Dickinson indicated that he wished to make another effort with Barone, but was concerned about a possible *Miranda* violation. To discuss this concern, as well as general strategy for obtaining information from Barone, Dickinson contacted Assistant United States Attorney Jeffrey Auerhahn in Boston. Auerhahn advised Dickinson that as long as Barone again acknowledged his *Miranda* rights, the detective could make another attempt to elicit cooperation.

In an apparent effort to assist Dickinson, authorities in Boston, including Auerhahn and Coleman, had arranged to meet Friday afternoon with Barone's brother-in-law, Walter Jordan. Jordan had agreed to provide significant information about the Limoli homicide. These officials hoped that, when they next questioned Barone, reference to details provided by Jordan would convey the impression that they did have a witness to implicate him. This, the government hoped, would give Barone an incentive to cooperate.

On Saturday evening, when Dickinson and Fleming returned to the jail, they did not ask Barone if he had changed his mind about discussing the Limoli murder. Nor did they give him a fresh set of *Miranda* warnings. They did mention, however, that he did not have to speak with them, and they also asked the defendant if he remembered his rights. Barone indicated that he did. After making sure that the conversation was not being recorded and that the officers would not take notes, Barone agreed to speak with them.

The discussion began in a friendly, low key manner on topics other than the Limoli homicide.[4] At some point during the course of the conversation, the detectives told Barone that they knew he was involved in the murder. They asked questions involving details obtained from Jordan. They repeated the assertion that Barone's life would be in danger in Boston. The district court found that this approach—highlighting the strength of the government's case against him and the danger he would face if returned to Boston without government protection—was intended "to induce [Barone] to change his mind about remaining silent concerning Limoli...." Order at 36.[5]

---

4. The district court found that the officers did not clearly convey that their relationship with him was adversarial and, indeed, did just the opposite:

> They acted friendly, they took no notes, they offered to let the defendant look in a bag to confirm that there was no recording device present. These actions were meant to relax the defendant's vigilance in regard to incriminating himself and perhaps lead him to think that he could later plausibly deny any incriminating statements because they were not being contemporaneously recorded.

Order at 34.

5. The government suggests in its brief that the threat of danger and the details from Jordan could not have instigated Barone's cooperation because those subjects were raised *after* he had waived his previously asserted right to remain silent. *See* Government Brief at 13 n. 20. This contention seriously misfires. Although Barone generally had agreed to talk with the officers when they first arrived at the jail Saturday evening, this did not constitute a waiver of his right to remain silent *on the Limoli murder*—the specific topic on which he had invoked his Fifth Amendment right on Friday.

Indeed, Detective Dickinson testified that the "small talk" between the officers and Barone did not turn to the Limoli murder until twenty or thirty minutes after the Saturday evening conversation began. The court and Dickinson engaged in the following exchange:

> COURT: [H]ow did the issue of Limoli come up?
> DICKINSON: I am sure we apprised him of our real interest in Limoli....
> COURT: What did he say in response?
> DICKINSON: I don't recall a specific response that that type of—that at that point we made our statements, you know, we know you were there, that sort of thing.
> COURT: It is that sort of thing that I want to know, I want to understand what you are saying.
> DICKINSON: It was not a Q and A—
> COURT: This all sounds a little confusing. You had small talk for 20 minutes, and that established or reestablished some rapport, is that right?
> DICKINSON: Yes.
> COURT: And, then you said to him, in effect, Well, you know we are not really here just to have small talk. As you know, what we are really interested in is the Limoli murder. And, we know you were involved with it. So, who's kidding who, and things like that. I don't want to put words into your mouth.
> DICKINSON: That was the tenor of the conversation.

The strategy succeeded. *Id.* Barone began Saturday night to provide information about the Limoli murder.[6] The district court found that his change of heart occurred because the government had failed to "scrupulously honor" his decision on Friday not to discuss the Limoli murder until he was back in Boston:

> I find the defendant was cajoled and subtly threatened by some of the facts concerning the potential case against him and the danger he would be in from Mr. Ferrara if he was returned to Boston.

Order at 37.

The court noted that, under *Miranda*, this finding of undue pressure on Barone to change his mind "may alone render his statements involuntary." *Id.* The court nevertheless went on to conclude that, taking into account the totality of the circumstances, Barone's waiver of his right to remain silent had been voluntary. According to the court, the defendant had sufficient age, intelligence and experience to execute a knowing waiver, knew his *Miranda* rights, and had, in fact, made a calculated decision to cooperate.

Barone discussed the Limoli murder with the detectives in another conversation the next afternoon, and, following his return to Boston on Monday, July 25, gave additional information to FBI Agent Michael Buckley and Detective Coleman. During the course of that interview, Barone called his sister, who informed him that she had hired a lawyer for him. Upon learning that he was represented by counsel, the officers immediately stopped questioning Barone. They indicated, however, that they would return to see the defendant the next day. He refused to see them at that time.

> COURT: That was the tenor of the conversation. You basically confronted him with the fact that you knew he was involved in the Limoli shooting? Right?
> DICKINSON: He denied that.
> COURT: And, he denied it?
> WITNESS: Yes.

Tr. July 30, 1991 at 196–97.

When asked if the discussion of danger in Boston preceded or followed this discussion of the Limoli murder, Dickinson replied that he couldn't remember but that "I am sure it came up several times." *Id.* at 198. Dickinson ac-

In March 1990, Barone, along with seven co-defendants, was charged in a 65–count superseding indictment with racketeering and numerous other offenses, including the murder of James Limoli. Barone subsequently filed his motion to suppress. As discussed above, the district court granted the motion based on its conclusion that the government did not "scrupulously honor" Barone's assertion of his right to remain silent about the Limoli homicide. Because the officers pressured the defendant to cooperate, the court concluded, Barone's statements must be suppressed under the principles set out in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), even though the statements were made voluntarily.

II.

A. *Legal Challenge*

The government argues that, in light of the voluntariness finding, the district court wrongly suppressed Barone's statements. We disagree.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court addressed an issue left unresolved by its landmark ruling in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966): once a suspect in custody invokes his right to remain silent, under what circumstances may the police resume questioning for the purpose of obtaining statements admissible against the defendant at trial? In answering this question, the Court rejected the extreme possibilities that, on the one hand, interrogation is forever barred after a suspect chooses to remain silent, and, on the other hand, that interrogation may resume following a "mo-

knowledged that the reason he raised the issue of danger was not "solicitude for [Barone's] health" but to persuade him to cooperate. *Id.*

6. We follow the district court's lead in not discussing the specific information provided so that we do not "publicize unnecessarily information which is now being suppressed." Order at 36. Some of the information is included in the officers' reports, which are contained in sealed Exhibits 8 and 9.

mentary cessation." 423 U.S. at 102, 96 S.Ct. at 326.

"The critical safeguard" identified in *Miranda*, the *Mosley* Court held, is a person's " 'right to cut off questioning,' " 423 U.S. at 103, 96 S.Ct. at 326 (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1627). By exercising that right, a suspect can "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," 423 U.S. at 103–04, 96 S.Ct. at 326–27. The requirement that law enforcement authorities respect the decision to terminate questioning "counteracts the coercive pressures of the custodial setting." *Id.* at 104, 96 S.Ct. at 326. The Court concluded, therefore, that the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether the government has "scrupulously honored" his right to cut off questioning. *Id.*

The government argues that *Mosley* sets up a dual standard, depending upon when police officers resume questioning. In its view, any statement obtained after only a "momentary cessation" in interrogation must be suppressed, whether or not a review of the surrounding circumstances would show that it was made voluntarily. In contrast, the government suggests, the admissibility of statements made after a sustained lapse in questioning—such as occurred in this case between Friday afternoon and Saturday night—turns on whether the totality of the circumstances demonstrates a voluntary waiver of the Fifth Amendment privilege.

█ We are unable to subscribe to this view of the law. Nowhere in its opinion does the *Mosley* Court suggest that the threshold test of admissibility varies depending upon the amount of time that has passed since a suspect invoked the right to silence. Nor does the test focus on the voluntariness of the challenged statements. Both Justice White's concurring opinion and Justice Brennan's dissent noted the majority's implicit holding that, under *Miranda*, some confessions must be ruled inadmissible even if they result from informed and voluntary decisions to waive

the previously asserted privilege. *See* 423 U.S. at 107–08, 96 S.Ct. at 328–29 (White, J., concurring); at 113, 96 S.Ct. at 331 (Brennan, J., dissenting). Indeed, arguing, as it does, that suppression is mandatory for statements made after a brief lapse in questioning, the government apparently concedes that the standard is not framed in terms of voluntariness.

In rejecting a voluntariness test, Justice Stewart, writing for the Court, simply carried forward the principles developed in *Miranda*. There, the justices recognized that in-custody interrogation imposes "inherently compelling pressures" on persons suspected or accused of crime, 384 U.S. at 467, 86 S.Ct. at 1624, and concluded that prophylactic rules governing police conduct are an effective means of neutralizing this setting, *id.* Thus, in determining the admissibility of a confession made in response to initial police questioning, *Miranda* directs courts to look at whether the law enforcement officers have followed specified procedures; if not, the suspect's confession is inadmissible, without inquiry into voluntariness. The presumption, of course, is that most confessions obtained without adherence to those procedures would be involuntary.

*Mosley* adopts the same approach for statements made later in the interrogation process. Based on the assumption that "repeated rounds of questioning" in the face of a decision to remain silent nearly always will undermine a suspect's will, *see* 423 U.S. at 102, 96 S.Ct. at 325, a Fifth Amendment violation is *presumed* unless the law enforcement officials have followed specified procedures. In this setting, the prophylactic requirement is that the police "scrupulously honor" the "right to cut off questioning."

There is one significant distinction between the *Miranda* and *Mosley* inquiries, however, and it undoubtedly explains the government's misapprehension of *Mosley*. Unlike the clearcut, purely objective test in *Miranda*—did the police officers fully inform the suspect of his rights before he confessed?—the inquiry in *Mosley* involves a multiple factor review. In evaluating

law enforcement conduct pursuant to *Mosley*, courts must consider, *inter alia*, the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence. 423 U.S. at 104–05, 96 S.Ct. at 326–27.

In determining whether Mosley's right to cut off questioning was fully respected, the Court noted that, after Mosley stated that he wanted no further discussion, Detective Cowie "did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position." *Id.* at 104, 96 S.Ct. at 327. Although there was subsequent questioning hours later, it "did not undercut Mosley's previous decision not to answer," for the subsequent questioner "focused exclusively on . . . a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been . . . interrogated by Detective Cowie." *Id.* at 105, 96 S.Ct. at 327.

The government mistakenly equates this "totality of the circumstances" scrutiny with the traditional voluntariness test, which involves a similar process but a very different analysis. The traditional examination into whether a defendant voluntarily, knowingly and intelligently waived his or her Fifth Amendment rights occurs when a suspect, after receiving the *Miranda* warnings, makes a confession. The scrutiny in such instances is broad, encompassing not only the nature of the police conduct but also such factors as the suspect's age, education and past criminal experience, and whether the suspect had the capacity to understand both the warnings given him and the consequences of waiving his rights. *See, e.g., Fare v. Michael C.*, 442 U.S. 707, 724–27, 99 S.Ct. 2560, 2571–73, 61 L.Ed.2d 197 (1979); *United States v. Melanson*, 691 F.2d 579, 588 (1st Cir.1981).

■ While the suspect's state of mind is central to the voluntariness finding, the *Mosley* test focuses on what the police did, and when, after the suspect exercised his or her right to remain silent. Indeed, the *Miranda–Mosley* rules are designed to give law enforcement agencies and courts "clear, objective standards that might be applied to avoid the vagaries of the traditional voluntariness test," *Mosley*, 423 U.S. at 113, 96 S.Ct. at 331 (Brennan, J., dissenting). Thus, under *Miranda* and *Mosley*, a court need determine specifically whether there has been a voluntary waiver only after the government has carried its burden of showing that it complied with the required procedures. *See Miranda*, 384 U.S. at 475–76, 479, 86 S.Ct. at 1628–29, 1630. *See also, e.g., Kelly v. Lynaugh*, 862 F.2d 1126, 1131 (5th Cir.1988).

■ The district court properly applied the *Mosley* standard. It carefully reviewed the police conduct following Barone's decision to remain silent about Limoli, finding that the officers repeatedly spoke to Barone for the purpose of changing his mind, failed to provide new *Miranda* warnings, applied pressure by emphasizing the danger he would face in Boston if he did not cooperate, and took advantage of a long delay in arraignment. *See infra* at 15–18. These circumstances led the court to conclude that the officers failed to respect his right to cut off questioning about Limoli. Under *Mosley*, this should have ended the court's inquiry. Its additional finding that the statements were voluntary did not, as the government urges, trump or undermine the prior conclusion; the voluntariness finding was unnecessary and, indeed, irrelevant. The district court impliedly recognized this by its order of suppression. We therefore reject the government's claim that the court misconstrued the law in suppressing Barone's statements.[7]

7. We need not, and do not, appraise the district court's determination that Barone's statements were voluntary. We note, however, that the court's subsidiary findings that the officers used psychological pressure, Order at 44, and "threatened and cajoled" Barone into talking about the Limoli homicide, *id.* at 7, seem inconsistent with its conclusion. *See Miranda*, 384 U.S. at 476, 86 S.Ct. at 1629 ("[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.").

Having disposed of the government's legal challenge to the suppression order,[8] we turn briefly to its contention that the district court erred factually in finding a *Mosley* violation.

## B. *Factual Challenge*

■ The district court comprehensively catalogued the various factors contributing to its decision, carefully comparing the circumstances here with those in other cases. *See* Order at 44–48. We find its analysis and conclusion unimpeachable.

Barone was approached by law enforcement officers four times before he began to discuss the Limoli homicide, including two contacts in which officers brought up the fact that he would be in substantial danger if he returned to Boston without cooperating. *See Vujosevic v. Rafferty,* 844 F.2d 1023, 1029 (3d Cir.1988) (suppression required where defendant questioned on four occasions about same crime, giving written statement only after officers "essentially bluffed him into agreeing"). On none of these occasions was he given full *Miranda* warnings. *See United States v. Hsu,* 852 F.2d 407, 410 (9th Cir.1988) (special concern expressed for "the provision of a fresh set of warnings"). The officers did not resume contact on any of these occasions by asking Barone if he had changed his mind about remaining silent concerning the Limoli homicide. Indeed, the district court found that on Saturday night, when Barone began to cooperate, Fleming and Dickinson used tactics intended to lower the defendant's guard against incriminating himself. *See* Order at 34. The reference to danger in Boston occurred well into that conversation, apparently when the officers sought to renew pressure on Barone to discuss the Limoli incident.[9]

Although more than twenty-four hours passed between the last contact on Friday and the officers' arrival at the jail on Saturday—a factor in the government's favor—this lapse of time was offset by two other circumstances. First, during the intervening period, the government worked to develop information that later was used to pressure Barone into cooperating. *Cf. Hsu,* 852 F.2d at 412 ("The record demonstrated that [the agent] exerted no pressure upon [the defendant] whatsoever. He merely read [defendant] his rights a second time, and [defendant] responded with a valid waiver.").[10] And, second, while the court did not find that the officers deliberately delayed Barone's arraignment from Friday afternoon to Monday morning, Order at 28, it did find that "the prolonged detention magnified the inherent coercion of being held in custody," *id.* at 46.[11]

---

8. The government also claims that the district court improperly focused on whether the officers had scrupulously honored Barone's "general right to remain silent" rather than on whether they had honored his "right to cut off questioning." According to the government, the right to cut off questioning was fully respected because "Barone controlled the time at which the questioning occurred, the subjects discussed, and the length of the interviews." Brief at 29. This argument is factually inaccurate; the officers, not Barone, initiated each discussion. Moreover, the court's conclusion that the officers violated Barone's right to remain silent was entirely appropriate based on its conclusion that they had violated the right to cut off questioning—the latter simply being the procedural safeguard for protecting the former.

9. Drawing a distinction relevant here, the court in *Vujosevic* explained why certain cases involving resumed questioning had not resulted in suppression while other cases had:

> [I]n none of those cases [where suppression was denied] did the facts give rise to an inference that the sole purpose for resuming questioning was to persuade the defendant to abandon his right to remain silent. In contrast, in several cases where the right to remain silent was held not to have been scrupulously honored, the circumstances lead to a conclusion that the police resumed questioning for no other reason than to induce the defendant to change his mind.

844 F.2d at 1029.

10. It is immaterial that the officers used accurate information in their contacts with Barone. Although the use of false or deceptive information certainly would count in the balance *against* the government, *see, e.g., Vujosevic v. Rafferty,* 844 F.2d 1023, 1030 (3d Cir.1988), the use of accurate information does not weigh in its favor if done for the purpose of pressuring the defendant to abandon his right to remain silent.

11. We note the dramatic contrast between these facts and what occurred in *Mosley.* When Mosley stated that he did not wish to answer questions about the two robberies for which he had

In sum, the focus on danger, the failure to repeat warnings, the increasing length of incarceration, the officers' efforts to ingratiate themselves, and the number of encounters deliberately aimed at eliciting cooperation on the same crime are sufficient to support a finding that this was a case "where the police failed to honor a decision of a person in custody to cut off questioning, ... by persisting in repeated efforts to wear down his resistance and make him change his mind," *Mosley*, 423 U.S. at 105–06, 96 S.Ct. at 327–28.

We therefore affirm the district court's order suppressing the statements made by Barone about the Limoli murder on Saturday, July 23, 1988 through Monday, July 25, 1988.

### III.

■ The suppression order did not directly address the admissibility of a statement the police officers claim that Barone made spontaneously in the car, telling the officers that they wanted Ferrara, not him. *See* Section I, *supra*, at pp. 3–4. As noted above, the testimony at the hearing about this comment was conflicting, with Barone contending that it was the officers who brought up Ferrara's name.

We agree with the government that a remand is necessary to allow the district court to make explicit findings on this point. If the court finds that Barone volunteered a statement about Ferrara before invoking his right to silence, the statement would, of course, be admissible. *See Miranda*, 384 U.S. at 478, 86 S.Ct. at 1629–30.

*Affirmed in part and remanded in part.*

SELYA, Circuit Judge (dissenting).

By stony adherence to a narrow reading of *Michigan v. Mosley*, 423 U.S. 96, 96

S.Ct. 321, 46 L.Ed.2d 313 (1975), this court today approves suppression of highly reliable statements, voluntarily made to law enforcement officers by a criminal defendant. I do not believe that *Mosley* requires such a result, particularly when read in the context of the Supreme Court's more recent jurisprudence. Thus, I respectfully dissent from Part II of the court's opinion.[12]

Prior to 1966, the litmus test for admissibility of incriminating statements devolved around whether the statements were made "voluntarily," giving that term the texture and gloss required by the Due Process Clause. The world changed in the blink of an eye. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that, because custodial interrogation was inherently coercive, incriminating statements made in the absence of certain clear warnings would be presumed to be involuntary. *Id.* at 467, 86 S.Ct. at 1624.

In *Mosley*, the Court went a step further, holding that, after assertion of the right to silence, statements made in response to custodial interrogation will be admissible only if the authorities have "scrupulously honored" the accused's right to terminate questioning. *Mosley*, 423 U.S. at 103, 96 S.Ct. at 326. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court clarified a distinction between asserting the right to remain silent and asserting the right to counsel. The Court established a bright-line rule: when an accused, in a custodial setting, invokes the right to counsel, the police must immediately cease all interrogation and may not resume questioning without the presence of counsel. *See id.* at 484–85, 101 S.Ct. at 1884–85.

---

been arrested, the police immediately ceased the interrogation "and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position," 423 U.S. at 104, 96 S.Ct. at 327. Approximately two hours later, he was questioned by another officer at a different location about an unrelated holdup murder. He received new and complete warnings at the start of the second interrogation. In these circumstances, the Court found that the resumed

questioning did not undercut Mosley's previous decision to remain silent and that, consequently, his incriminating statement was admissible at trial.

**12.** I fully concur with my brethren's reasoning and result as expressed in Part III of the court's opinion.

Bright-line rule or not, *Edwards* has sometimes been treated grudgingly by the Court. *See, e.g., Connecticut v. Barrett,* 479 U.S. 523, 529–30, 107 S.Ct. 828, 832–33, 93 L.Ed.2d 920 (1987) (holding that admission of oral statements voluntarily made by accused after he had stated that he would not make a written statement without advice of counsel did not violate *Edwards*). More to the present point, in the eleven years which have passed since *Edwards* was decided, the Court has refused to interpret *Mosley* as establishing a comparable bright-line rule regarding the right to silence. *See Minnick v. Mississippi,* — U.S. ——, ——, 111 S.Ct. 486, 497, 112 L.Ed.2d 489 (1990) (Scalia, J., dissenting) (noting that a "suspect in custody who says categorically 'I do not wish to discuss this matter' can be asked to change his mind"). Indeed, in the seventeen years since *Mosley* was announced, the Court's opinions have begun more and more to emphasize voluntariness when assessing *Miranda* violations. *See, e.g., Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987); *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

This backdrop is colored by the fact that the Court has lost few opportunities to remind us that the root purpose of *Miranda* (and of the procedural rules emanating from it) is neither to discourage voluntary confessions nor to preclude their use. *See, e.g., McNeil v. Wisconsin,* — U.S. ——, ——, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991) ("the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good"); *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986) ("Admissions of guilt are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punish-

ing those who violate the law.") (citation omitted). Ineluctably these principles inform the case at hand.

Here, Barone asserted his right to remain silent regarding the Limoli murder during three attempted interrogation sessions. On each occasion, questioning anent the murder stopped and was not resumed for several hours. Ultimately, he volunteered the inculpatory statements. The district court specifically found that those statements resulted not from police coercion, but from a knowing and voluntary waiver of the defendant's right to remain silent.[13] This determination of voluntariness must carry the day. In light of it, and because the district court found that the officers reminded Barone that he was not obligated to speak to them and confirmed that he had his rights in mind, I do not believe that *Mosley* requires the suppression of the statements at issue.

I do not plan to wax longiloquent. In due course, the Court will take *Mosley's* measure. For now, I am content to say that, in my view, the district court's findings are tantamount to a finding that the shortfall in the authorities' conduct did not impermissibly impinge upon either Barone's free exercise of his will or his right to cut off questioning at the crucial moment. Thus, suppression of the incriminating statements was improper. *Cf., e.g., Arizona v. Fulminante,* — U.S. ——, ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (admission of confessions obtained in violation of *Miranda* principles is subject to harmless-error review); *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293 ("If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.").

While I understand the majority's desire to resolve *Mosley's* ambiguity to the defendant's benefit, I prefer to resolve that ambiguity in line with the Constitution as I read it, the interests of an ordered society,

---

13. The majority has eschewed direct disagreement with this finding, preferring instead not to "appraise the district court's determination that

Barone's statements were voluntary." *Ante* at 1384 n. 7. I assume, for present purposes, that the finding was not clearly erroneous.

and the Court's most recent expressions. Hence, I would reverse the suppression order.