UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-2309

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE V. ANDRADE, JR.,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge] 



Before

Boudin, Circuit Judge, 

Coffin, Senior Circuit Judge, 

and Dowd,* Senior District Judge. 



Miriam Conrad, Federal Defender Office, for appellant. 
James F. Lang, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, was on brief for the United 
States.



February 3, 1998


 

*Of the Northern District of Ohio, sitting by designation.

BOUDIN, Circuit Judge. Jose V. Andrade, Jr., appeals 

from his conviction for conspiracy to engage without a

license in the business of dealing in firearms, 18 U.S.C. 

371, 922(a)(1)(A) (1994), and for transporting firearms

without a license into his state of residence, id.  

922(a)(3). The facts pertaining to the issues raised on

appeal are largely undisputed. As the sufficiency of the

evidence is not an issue, we abbreviate the facts. 

Andrade, a native of Boston, attended Jackson State

University in Jackson, Mississippi, during 1993 and 1994. At

the time, the authorities suspected Andrade of moving guns

illegally from Mississippi to Massachusetts. On December 16,

1994, Andrade--then in Boston for Christmas vacation--was

arrested and questioned in circumstances described below.

His family apartment and two others occupied by cousins were

searched on the same day based on search warrants or consent.

Andrade was released the same day, questioned at home on

December 19, and rearrested in March 1995.

On April 26, 1995, Andrade was indicted for conspiracy

to engage in gun dealings, together with Christopher Todd and

Terrance Smith, who were alleged to have purchased guns for

Andrade in Mississippi; as residents, it was easier for them

to purchase guns than for Andrade to do so. In January 1996,

the grand jury issued a superseding indictment against

Andrade, adding the second count (transporting firearms into

-2- -2-

Massachusetts). By that time, Todd had pled guilty, and

charges against Smith had been dismissed.

On May 8, 1996, the district court issued a decision

refusing to suppress statements that Andrade had made to the

authorities on December 16 and December 19 and refusing to

suppress the results of the searches of December 16. United 

States v. Andrade, 925 F. Supp. 71, 81 (D. Mass. 1996). 

Andrade was tried before a jury in May 1996, the trial

lasting about two weeks. The most damaging testimony was

given by Todd and Smith.

Both men gave detailed accounts of Andrade's requests to

them in 1993 and 1994 to buy handguns and his statements that

he planned to take them to Boston to sell. Todd and Smith

each described multiple occasions on which, in Andrade's

company, they purchased handguns for Andrade in different gun

shops and pawnshops, Andrade selecting the weapons and taking

them afterwards from Todd or Smith. Certain of the guns were

later recovered by the police in Boston.

Two pawnshop employees, from different pawnshops,

identified Andrade as an individual who accompanied Todd on

specific occasions. Michael Spinola, Andrade's first cousin

and friend, admitted saying that Andrade had told Spinola

that he was bringing guns from Mississippi to Boston to sell

and that Spinola had seen some of the weapons; but although

Spinola had given detailed testimony to this effect to the

-3- -3-

grand jury, at trial he described much of it as lies. There

is also testimony from a former friend of Andrade, who said

that in December 1994 after the search warrants were

executed, Andrade had asked the friend whether he would store

a suitcase of guns for Andrade.

Andrade sought to impeach government witnesses.

Although he did not testify himself, Andrade offered

testimony of Manuel Correia, who had been his roommate at the

University in Mississippi. Correia said that he had driven

from Jackson to Boston with Andrade three times, had seen or

helped Andrade pack, and had never seen any guns around.

Andrade's own statements, and some of the evidence seized

from the apartment searches, were introduced by the

government.

The jury retired to deliberate on May 29, 1996. The

next day it asked the court to answer a question about the

substantive count (transporting guns into Massachusetts); the

question and court's reply are at issue on appeal and are

discussed below. On May 31, Andrade was convicted on both

counts and later sentenced to 46 months in prison. 

Andrade's first claim of error is that the district

court admitted statements that Andrade had made during his

December 16 interrogation at the police station. After his

arrest, Andrade was taken to an office in a Roxbury police

substation and handcuffed to a chair. There, Bureau of

-4- -4-

Alcohol, Tobacco and Firearms agent Daniel Campbell read

Andrade the Miranda warnings, see Miranda v. Arizona, 384 

U.S. 436, 478-79 (1966), and asked him if he understood his

rights; Andrade said that he did. A state police officer,

Francis Matthews, was also present. 

Campbell told Andrade that he was under investigation

for gun shipments, and that the police had search warrants

for two premises connected with Andrade. Andrade said that

he had bought guns in Mississippi but that he was a collector

and not a dealer. Andrade also identified a third apartment

where he had stayed. Campbell then went to execute the

search warrants and obtained permission from the owner to

search the third apartment. 

After Campbell left, an INS agent sought to question

Andrade about his immigration status. Andrade refused, so

Matthews told the agent to leave. A Boston police officer

then entered and, hearing Andrade tell Matthews that he was

not a firearms dealer, accused Andrade of lying; there was an

angry reply from Andrade, and Matthews told the detective to

leave. After some further discussion between them, Matthews

said to Andrade that he would not keep bothering Andrade if

he didn't want to talk, and Matthews then spent about two

hours on paperwork while Andrade slept in the chair.

At some point during the searches, police apparently

suggested to Andrade's sister that she talk to him by

-5- -5-

telephone; she did so, crying and pleading with Andrade to

talk to the police. When Campbell returned to the

substation, Andrade had been held for about four hours.

Campbell woke him and asked him if he remembered the rights

that had been read to him earlier. Andrade said that he did.

At this point, Campbell said that he knew that Todd and

Smith had purchased guns for Andrade in Mississippi. Andrade

replied that he knew Todd and Smith and was present when they

purchased guns. Andrade admitted that he obtained guns from

Todd and Smith but said that he had sold them in Mississippi

to three men from Houston, although he also admitted having

given a couple of guns to two men in Boston. 

Andrade was released after offering to cooperate with

the police in retrieving weapons that the police thought were

still at large in Boston. Seeking this cooperation, Campbell

and a Boston Police detective visited Andrade at home on

December 19, where Andrade said that three men from Houston

would soon be arriving in Boston with weapons and drugs.

Andrade offered to introduce the men to Campbell. Andrade's

statements on both days were offered in evidence at trial. 

In this court, Andrade does not claim that the

statements he made were involuntary. Instead, he says that

by repeated questioning police failed to honor his right to

remain silent under the Miranda doctrine, see Michigan v. 

-6- -6-

Mosley, 423 U.S. 96, 104 (1975), and that when Campbell 

resumed questioning after completing the apartment searches,

there was no adequate waiver when Andrade made the statements

in the second interrogation. The district court held

otherwise, and we agree. 

Miranda requires that the police warn a suspect in 

custody of his right to counsel and his right to remain

silent. If the police have failed to give the warnings and

obtain a waiver of rights, the statements are excluded, even

if otherwise voluntary. Where the suspect asserts that he

wants to consult with counsel, questioning must cease until

counsel is provided. See Edwards v. Arizona, 451 U.S. 477, 

484-85 (1981). But when a defendant invokes his right to

remain silent, Mosley makes clear that the police are not 

automatically forbidden from later resuming interrogation.

Andrade's initial statements to Campbell were

voluntarily made after full warnings. Andrade's later rebuff

of the INS agent and police detective were refusals to speak

to them but were not couched as a refusal to talk with

anyone. When Matthews ended his own questioning, it appears

that Andrade no longer wanted to talk with Matthews, but

neither did Andrade rule out the possibility of talking

later. 

We see nothing wrong with Campbell's decision to resume

questioning of Andrade after the searches. A reasonable

-7- -7-

interval separated the two periods of questioning, see 

Mosley, 423 U.S. at 106, and there was no repeated attempt to 

reverse a refusal to talk through undue pressure. The

circumstances were quite different in United States v. 

Barone, 968 F.2d 1378 (1st Cir. 1992), where the defendant 

resisted questioning, was held for over 24 hours, was

interrogated four times before he began to discuss the crime,

and was twice intimidated by suggestions that he "would be in

substantial [physical] danger if he returned to Boston

without cooperating." Id. at 1385; see also id. at 1386. 

Whether Andrade's later statements reflected a waiver of

his right to remain silent is a closer issue. The problem is

that the Supreme Court has said, almost in the same breath,

that "mere silence is not enough" for a waiver, but that this

"does not mean that the defendant's silence, coupled with an

understanding of his rights and a course of conduct

indicating waiver, may never support a conclusion that the

defendant has waived his rights." North Carolina v. Butler, 

441 U.S. 369, 373 (1979). The waiver issue, it appears, must

be decided on the facts. See id. at 374-75. 

Here, we have no reason to doubt that Andrade knew that

he had a right to remain silent; at the outset of the second

round, Campbell reminded him of the earlier warnings, and

Andrade confirmed that he remembered. As for the intervening

events, Matthews' dismissal of the INS agent and police

-8- -8-

detective, when Andrade demurred, fairly conveyed the message

that Andrade was in charge of the decision whether and to

whom he would speak. By ending the initial round of

questioning, Matthews himself reinforced this message.

Andrade's subsequent admissions to Campbell were not

confessions wrested from a reluctant detainee. Andrade's

statements were partly consistent with Andrade's cover story

(selling the weapons to three men from Houston) and partly an

attempt to explain away the presence of some of the weapons

in Boston. In short, Andrade had a rational reason for

choosing not to remain silent. While a written waiver would 

have helped the government, it is not a mechanical

requirement.1

Andrade's next claim is that the trial court's

instructions on the first count--conspiracy to deal in

firearms without a license--set too low a scienter

requirement. 18 U.S.C. 924(a)(1)(D) provides that a number

of weapons offenses, including the offense of dealing without

a license, require that the proscribed conduct be willfully

undertaken. Andrade's counsel asked the court to instruct

the jury that this in turn required proof beyond a reasonable

doubt that "the defendant knew that Section 922(a)(1)(A)

 

1Compare United States v. Christian, 571 F.2d 64, 66, 69 
(1st Cir. 1978) (no waiver where a defendant's signature on
an FBI waiver form showed that he had admitted being advised
of his rights, but conspicuously omitted his signature on the
line provided for a waiver of those rights).

-9- -9-

requires one who engages in the business of dealing in

firearms to obtain a dealer's license from the Secretary of

the Treasury."

The district court refused to give this instruction.

Instead, it told the jury that one acts willfully when he

intentionally commits acts proscribed by law "with knowledge

that his conduct is unlawful." The court said that knowledge

of illegality had to be proved beyond a reasonable doubt.

But it also instructed that the government did not have to

prove that the defendant knew of the specific statute that he

was charged with violating or that he intended to violate

that particular statute.

If case law from other circuits is put to one side, the

issue appears easy. The term "willful" is used in various

ways, but the standard definitions normally emphasize that a

defendant acted "with knowledge that [his] conduct is

unlawful," 1 L. Sand, J. Siffert, W. Loughlin & S. Reiss,

Modern Federal Jury Instructions 3A.01, at 3A-18 (1997). 

Willfulness is often required where a statute outlaws conduct

commonly thought to be lawful. In some measure, the

willfulness requirement reverses the usual rubric that

ignorance of the law is no defense. Just how much ignorance

may be needed is a different matter.

Nothing in the traditional willfulness instruction, nor

in its underlying purpose, requires that the defendant

-10- -10-

possess specific knowledge of the statutory provision that

makes his conduct unlawful. To impose such a requirement of

detailed knowledge of the firearms statutes (to which few

judges could pretend) would make an enforcement of the gun

dealer laws very difficult. And the requirement goes well

beyond what is needed to screen out an innocent who honestly

thought that his conduct was lawful.

Our view accords with the purpose of Congress in

adopting the willfulness requirement in the Firearms Owners'

Protection Act of 1986, Pub. L. 99-308, 100 Stat. 449.

Congress's concern was that, because of the nature of the

conduct and technicality of the statute, some offenses might

be committed by individuals who were unaware that their

conduct had been made criminal.2 Nothing indicates that

Congress was concerned with protecting individuals who knew

that their conduct was unlawful but might not be able to cite

chapter and verse as to which precise provision made it so.

The proponents of the willfulness requirement, to the

extent that we can discover their comments, said nothing to

suggest that the term was intended to go beyond its ordinary

 

2The willfulness requirement applies to some gun crimes
and not others, and the dividing line is crudely drawn
between actions that anyone might expect to be unlawful, see, 
e.g., 18 U.S.C. 922(v), 924(a)(1)(B) (semiautomatic 
assault weapon crimes), and actions that might not always
appear unlawful, see, e.g., id. 922(e), 924(a)(1)(D) 
(shipping a firearm in interstate commerce without written
notice to the common carrier).

-11- -11-

meaning, that is, awareness that one's conduct is unlawful.

The only suggestions that the statute might require knowledge

of the "details" of the law came from opponents of the

amendment; given the incentive to exaggerate, such remarks

normally get little weight. NLRB v. Fruit & Vegetable 

Packers & Warehousemen, Local 760, 377 U.S. 58, 66 (1964).3 

The Second Circuit has squarely ruled that the

government need only prove that the defendant knew that his

conduct was illegal. United States v. Collins, 957 F.2d 72, 

76-77, cert. denied, 504 U.S. 944 (1992). Accord United 

States v. Allah, 130 F.3d 33, 38-41 (2d Cir. 1997); United 

States v. Bryan, 122 F.3d 90, 91 (2d Cir.), cert. granted, 

118 S. Ct. 622 (1997). The Seventh Circuit's decision in

United States v. Obiechie, 38 F.3d 309 (1994), largely points 

toward a standard of general knowledge of illegality,

although one sentence suggests that knowledge of the

licensing requirement may be required. See id. at 316. 

Several other circuits--including the Third and Eighth--

say generally that the defendant must have "knowledge of the

 

3Compare 132 Cong. Rec. 6876 (1986) (statement of Rep. 
Hughes) (opponent's comments that the new statute would
require the defendant to know "what the law is, every detail
of the law. . . . [I]t would be a prosecutor's nightmare"),
with id. at 6861 (statement of Rep. Boehlert) (supporter's 
comment that the statute rejected mere knowledge of conduct
in favor of "some sort of criminal intent"). The scattered
and extensive legislative history is recounted in D. Hardy,
The Firearms Owners' Protection Act: A Historical and Legal
Perspective, 17 Cumb. L. Rev. 585, 604-07, 645-53 (1987). 

-12- -12-

law," e.g., United States v. Hayden, 64 F.3d 126, 130 (3d 

Cir. 1995) ("the defendant must have acted with knowledge

that his conduct was unlawful"); United States v. Hern, 926 

F.2d 764, 767 (8th Cir. 1991) ("`willful' means an

intentional violation of a know legal duty"). But this

language could be read either to support Andrade or the

Second Circuit. And the matter is further confused because,

in purporting to disagree with the Second Circuit, several

such decisions misunderstand its position.4

Admittedly, two other circuits say that conviction

requires proof that the defendant was aware of the licensing

requirement itself, but we do not find these cases

persuasive. See United States v. Rodriguez, 1997 WL 797506, 

at *4 (5th Cir. Dec. 31, 1997); United States v. Sanchez- 

Corcino, 85 F.3d 549, 553-54 (11th Cir. 1996). Even 

decisions like Rodriguez, purporting to require specific 

awareness of the statute, dilute the requirement by inferring

specific knowledge from circumstantial evidence. See 

Rodriguez, 1997 WL 797506, at *4. 

Such evidence is likely to be good proof that the

defendant knew that his conduct was unlawful but very thin

 

4The Third Circuit, for example, ascribes to the Second
Circuit the view that the government need prove only that the
defendant knew what he was doing. Hayden, 64 F.3d at 130 
n.6. The Second Circuit has, to our knowledge, never
expressed this view. See Collins, 957 F.2d at 77 (the 
evidence "demonstrate[d] that Collins understood that his
firearms sales violated the law").

-13- -13-

evidence that the defendant knew what statute made it so.

See Rodriguez, 1997 WL 797506, at *6 ("counter-surveillance 

operations," "unease about the sale," and "experience at `The

Bunker' and with firearms" gave defendant a "background from

which she should have been familiar with the firearms laws").

See also Obiechie, 38 F.3d at 316 ("An inference of knowledge 

could be drawn from the fact that [defendant] had listed

`gift' as his reason for purchasing the [guns] . . . after

having indicated that the first two purchases were for retail

sale."). Since juries are being allowed to convict on the

basis of such evidence, nothing is gained by instructing the

jury with language suggesting that the standard is higher

than it actually is. 

Nor is Andrade's position supported, as he claims, by

Ratzlaf v. United States, 510 U.S. 135 (1994). Ratzlaf held 

that a currency structuring violation required "knowledge of

illegality [as] an element" to show willfulness, Bates v. 

United States, 118 S. Ct. 285, 290 n.6 (1997), which is just 

what the district court told the jury here. In Ratzlaf, 

knowledge of a specific statute (or something close to it)

was also required--not because of the willfulness requirement 

but because the statute itself required a "purpose of evading

the reporting requirements" of 31 U.S.C. 5313(a). See 31 

U.S.C. 5324. This additional wrinkle is not part of the

present case.

-14- -14-

In short, after surveying the cases, we feel on solid

ground in joining the Second Circuit position that it is

enough that the defendant be aware that his conduct is

unlawful. Such knowledge, needless to say, depends upon the

circumstances. In our case, the scale of Andrade's gun

smuggling activity, his denials of gun dealing in the police

station, and other evidence that he sought to hide the

weapons are powerful indications of his awareness. Andrade

himself makes no claim that the evidence is insufficient on

this score if the district court's instruction is upheld.

The remaining claim of error that we think necessary to

address concerns a supplemental instruction given by the

district court in answer to a question from the jury. The

second count charged Andrade with the substantive offense of

transporting firearms without a license into a state of

residence. Following the charge and a period of

deliberation, the jury submitted a written question to the

court as follows:

The jury requests a description of clarification of
the term "transport" as it is used in Page 22 of
the Jury instructions, i.e.: Does defendant have
to personally transport or deliver guns? Is (sic)
acceptance of said guns in Massachusetts constitute
transportation, especially in the phrase "to
transport into" or "receive"?

After consulting with the parties, the district court

told the jury that, given the government's theory of the

case, it would not be enough for the jury to conclude that

-15- -15-

the defendant "merely received or accepted guns in

Massachusetts."5 However, the court said that Andrade would

be guilty if he had caused "an agent, employee or other

associate" to bring the guns into Massachusetts. Andrade's

counsel, in turn, objected to this further supplemental

instruction.

The supplemental charge was legally correct. At common

law one is liable as a principal if one deliberately causes

or procuring another to perform a criminal act, 2 W.R. LaFave

& A.W. Scott, Jr., Substantive Criminal Law 6.6(a), at 126 

(1986), and the principle has been carried forward by 18

U.S.C. 2(b). Unlike aiding and abetting liability, id.  

2(a), there is no requirement that the intermediary be shown

to be criminally liable. Section 2(b) is not a separate

offense but a general principle of liability that applies

without any need for reference in the indictment. United 

States v. Sabatino, 943 F.2d 94, 99-100 (1st Cir. 1991). 

Andrade says that delivering the instruction after

closing arguments violated Fed. R. Crim. P. 30, which

requires that the court rule on requested instructions "prior

to their arguments to the jury." By its terms and, as a

 

5In his original instructions, the trial judge had
already told the jury--consistent with the indictment--that
the charge against Andrade had as a necessary element that he
had transported the guns into Massachusetts. However,
earlier the judge had quoted the statute in full, and the
statute makes transportation or receipt criminal, if other 
conditions are met--which may explain the jury's question.

-16- -16-

matter of necessity, Rule 30 refers only to rulings on

instructions requested by counsel "[a]t the close of the

evidence or at such earlier time" as the court directs. Fed.

R. Crim. P. 30. The rule simply does not prescribe the

procedure for supplemental instructions after the jury has

retired. See United States v. Fontenot, 14 F.3d 1364, 1368 

(9th Cir.), cert. denied, 513 U.S. 966 (1994). 

The defense now says that at least it should have been

allowed to address the jury on this "new theory," pointing

out to it that there was no specific evidence that anyone had

transported the guns at Andrade's direction. We agree that a

refusal to permit further argument made necessary by a

supplemental instruction could amount to error. But here it

is enough to say that no such request to make further closing

argument after the supplemental instruction was made in this

case.

Further, the notion of prejudice is fanciful. Defense

counsel pointed out to the jury in her original closing that

there was no direct evidence showing Andrade's transportation

of the guns to Massachusetts. It had to be equally clear to

the jury that there was no direct evidence that Andrade had

asked an "agent, employee or other associate" to transport

the guns for him. To spell out the obvious would have added

nothing.

-17- -17-

At the same time, there was enough evidence for a jury

to conclude that somehow Andrade had managed to get 

Mississippi guns to Boston; among much else, Andrade had told

Todd and Smith that he planned to do so, and some of the guns

had in fact been recovered here. The government had no

obligation to prove the means of transportation. In context,

the supplemental instruction did little more than make this

clear to the jury, and properly so.

There is no need to address in detail Andrade's final

attack on the trial judge's instructions; taken as a whole,

we do not believe the charge tended to mislead or confuse the

jury. Although Andrade's arguments have not prevailed, we

think it fair to note that several of them are substantial

and that Andrade has been represented on this appeal with

singular skill and ingenuity.

Affirmed. 

-18- -18-